MELMAN FRUIT COMPANY, INC., Appellant, v. DAVE MELMAN et al., Appellees.

No. 41280.

46

DECEMBER 13, 1932.

REHEARING DENIED MAY 2, 1933.

W. T. Bennett and O. H. Allbee, for appellant.

F. E. Northup and E. N. Farber, for appellees.

EVANS, J.—We have to consider first a medley of controversy over questions of practice and procedure in this court. The

appellant took its appeal and filed its abstract in due course. All its procedure was apparently in due form. The appellees thereupon filed a purported "Denial of Abstract". This denial challenged the existence of any record in the district court in support of the abstract. At the same time the appellees filed a motion to strike from the appellant's abstract all the purported evidence on the ground set forth in its "Denial of Abstract". They supported their motion with certain affidavits to the effect that neither a transcript of the shorthand notes of the trial nor the shorthand notes themselves were to be found in the office of the clerk of the district court from which the appeal was taken. Thereupon the appellant supported its abstract by filing in this court the certified shorthand notes and the certified transcript thereof. In response to the affidavits of appellees, counter affidavits were filed. It is made to appear that the appellees' denial that the shorthand notes were in the office of the clerk was *colorable* only. The court reporter had taken the shorthand notes, as is customarily done, for the purpose of preparing the transcript. On the date specified in the affidavits of the appellees, the notes were still in the hands of the court reporter. They were immediately returned by him upon the request of the clerk. They were always subject to the call of the clerk while in the hands of the court reporter. The transcript of the shorthand notes, which had been made and duly certified, was in the hands of appellant's attorneys for the purpose of preparing their abstract. It was subject to the use of the appellees at any time upon request. It was promptly tendered in resistance to the motion to strike. Such transcript had not been actually filed in the district court, but was promptly filed thereafter, and was duly certified to this court. Appellant's abstract was filed within one hundred twenty days, as provided by statute. (Code 1931, section 12847.) The contention of the appellees by their motion is in substance that the abstract was void and of no effect, in the absence and during the absence of the shorthand notes from the office of the clerk of the district court; and was likewise void and of no effect until a transcript had been certified and filed in the district court; that, inasmuch as the shorthand notes were not returned to the clerk's office until after the expiration of one hundred twenty days, and inasmuch as the transcript had not been actually certified and filed in the district court within one hundred twenty days, the filing of such abstract was ineffective as a compliance with the requirements of the statute.

Under our present statutes, no specific time limit is put upon the filing of the shorthand notes or of the transcript thereof in an equity case, triable *de novo* here. We had occasion quite recently to consider the state of legislation on that subject. The question was carefully considered and reviewed by the late Judge Morling in Andrew v. Farmers Trust & Savings Bank, 206 Iowa 1368, 222 N. W. 553. We held in substance in that case that a certification was timely if made within a reasonable time after the necessity therefor was made apparent. In that case the certification was made after the lapse of sixteen months. The same question had been considered by us in City of Ottumwa v. McCarthy Imp. Co., 175 Iowa 233, 150 N. W. 586, 154 N. W. 306, Ann. Cas. 1917E, 1077; and again in Finley v. Thorne, 209 Iowa 343, 226 N. W. 103. The appellees are relying upon certain of our early cases, which were decided while sections 3181 to 3183 of the Code of 1873 were in force. Those statutes expressly required a filing of the *transcript* in this court within a fixed period. The requisite for a transcript was later repealed. In lieu thereof the appellant was required to file an *abstract*. The new legislation gave to the abstract a presumption of correctness, in the absence of challenge by the appellee.

We hold that the filing of its abstract by the appellant within the statutory time was a compliance with present legislation, and that such filing was in no manner vitiated by the absence of the shorthand notes from the clerk's office or by the failure to file the transcript in the district court before filing the abstract in this court.

II. The defendant-appellee filed an amendment to his motion to strike the abstract wherein he set up an additional ground for such motion. This amendment was supported by affidavits and resisted by counter affidavits. The additional ground of the motion as set forth in the amendment was that the court reporter had in fact failed to *subscribe* to his certification of the shorthand notes. In support of his amendment to the motion, he filed certain affidavits in this court. The recitals of the affidavits and counter affidavits were to the effect that at the close of the trial in the court below the court reporter prepared a certificate for the signature of the judge, and another certificate for his own signature, to be attached to the shorthand notes; that the certificate to be presented to the judge was duly signed and attached; that the certificate to be signed by the court reporter contained his name written in the body of the certificate in his own hand, but by oversight his name was not sub-

scribed to said certificate; that the body of the certificate set forth the name of the court reporter and his official designation; that the name inserted in the body of the certificate was written by the court reporter; that some time thereafter the court reporter discovered the omission and corrected it by filing a new certificate which was complete and perfect in form. These alleged facts were made to appear by affidavits only. These affidavits were filed in this court only, and are contradictory to the certification of the clerk of the district court. The record here, as certified by the clerk of the district court, discloses a perfect record in the court below. There is therefore no infirmity in the record here. We must accept the record as certified to us by the proper officer. There is no discrepancy between the actual record in the court below and the record here. If the appellee is entitled to have the record amended in the court below to show facts which do not now appear therein, it was his privilege to apply to the lower court for an amendment of the record. He cannot originate here an attack upon the correctness of the record below. His remedy is to move for such correction in the trial court. This the appellee did not do.

However, assuming it to be true that the court reporter failed in the first instance to attach to his notes a proper certification, we know of no reason why a proper certification might not be later made. As indicated in our foregoing division, the statute puts no time limit upon the certification either of the shorthand notes or of the transcript of the evidence. The later certification was therefore as valid as if it had been made in the first instance.

III. Other than the "Denial of Abstract" already referred to, the appellees have filed no amendment to appellant's abstract. They rely wholly upon their purported denial as casting upon the appellant the duty to file an additional abstract conforming to their complaints. They have filed an argument wherein they complain of the incorrectness of appellant's abstract. In such argument they assert that they are not financially able themselves to incur the expense of an additional abstract. Such attitude avails nothing. The statutory procedure in such a case requires the appellees, if not content with the abstract filed by appellants, to file an additional abstract in which they shall set forth such corrections and additional matters of record as they deem material for the fair presentation of the appeal. The mere denial of appellant's abstract may be sufficient as a challenge to the existence of any record at

all in support thereof. We shall so assume. But, if the appellees' claim that the appellant's abstract is unfair in its omissions and mistaken in what it purports to include, they cannot rely upon a mere denial of the correctness of appellant's abstract. The statute awards them the privilege of presenting by amended abstract their version of the record. If they refuse or fail to avail themselves of the statutory method, then they are deemed to acquiesce in the fairness of appellant's abstract.

In their argument the appellees refer to the transcript. The only function which a transcript serves in this court is as an arbiter between two conflicting abstracts. Where the contentions of the litigants differ as to the state of the record, we refer to the transcript to discover which is right and which is wrong. When we determine that dispute, the function of the transcript is performed. We must read the case from the abstracts and not from the transcript.

It follows that the complaint of the appellees as to the unfairness of appellant's abstract will not avail them, in the absence of an additional abstract in their own behalf.

IV. Prior to the events involved in this record, the defendant Dave Melman operated a fruit business in the city of Marshalltown under the trade-name of "Melman Fruit Company." In February, 1930, pursuant to a contractual arrangement between him and one I. Rovner and one C. J. Rasdal, the business was incorporated, and the stock of the corporation was divided among the three named persons. The purpose of the incorporation was to carry on the fruit business of Melman on a larger scale. Melman had an investment in the business of approximately $30,000 net. His indebtedness, however, approximated the net amount of his investment, so that he was lacking in working capital. Rasdal was his experienced employee. Rovner was an old acquaintance, who had recently sold out his business in Boston, and who was now ready to invest in a new enterprise. It was agreed between them that they would organize a corporation, which should take over the existing business of Melman at an agreed value; that Melman and Rovner would each take $30,000 of the stock of the proposed corporation; that each of them should sell to Rasdal $10,000 of such stock, and take his note in payment therefor due in three years. It was also agreed that they would sell to Mrs. Asher, an employee, $600 worth of such stock. Pursuant to such understanding, the cor-

poration was organized under the name "Melman Fruit Company", and as such corporation they took over the former business of Dave Melman under his trade name. The new organization took charge of the business in the latter part of February, 1930, beginning about February 18. In the first twelve days of March an invoice of Melman's property was taken by a public accountant and valuations agreed upon. The invoice disclosed a net amount of $30,240. This included all the property in the business, both real and personal, and represented the net worth of Melman. It appears that Melman had purchased the real estate in November preceding by executory contract only. The purchase price was $6,000, and Melman made a payment thereon of $1,000. Deferred payments were provided for, and time was made of the essence of the contract. After the purchase, Melman invested a considerable sum in refrigeration and other improvements upon the newly acquired property. He claimed the value of his equity and of his investment therein to be $3,000, and this amount was agreed to by the other contracting parties. The question of the ownership of this real estate presents the only controversy in this case. On February 18 the parties went to the office of the then attorney of Melman for the purpose of having their agreement reduced to writing. Their interview with the attorney was brief and hurried. They returned a few days later and signed the contract prepared by the attorney and presented to them for such purpose. This was as follows:

"Exhibit 'A' Contract

"This triplicate contract and agreement made and entered into this 18th day of February A. D. 1930 by and between Dave Melman, I. Rovner and C. J. Rasdal, all citizens of Marshalltown, Iowa.

"Witnesseth: Whereas, Dave Melman now owns and operates a wholesale fruit business in Marshalltown, Iowa, known as the Melman Fruit Company, and

"Whereas, he is desirous of incorporating said company, and I. Rovner and C. J. Rasdal are agreeing to take a certain amount of the stock in said corporation, and

"Whereas, said Melman Fruit Company has been inventoried by the above named parties and it is agreed by and between them that the Melman Fruit Company, including all personal property to-wit: fixtures, fruits, vegetables, trucks, and everything used and kept in said business including all book accounts, is to show an invoice of

$30,000.00 net and is to be taken in on the corporation at said figures.

"I. Rovner agrees to put in cash the amount of $30,000.00 the receipt of which is hereby acknowledged, and from the date of the signing of this contract is the owner of an undivided one-half interest in the said Melman Fruit Company as above set forth.

"It is further agreed to incorporate said company under the laws of the State of Iowa for the sum of $75,000.00 and that stock shall be issued, $30,000.00 to Dave Melman and $30,000.00 to I. Rovner as their interests may appear.

"It is further agreed that when the corporation is formed and stock issued that Dave Melman agrees to sell to C. J. Rasdal $10,000 of his stock and I. Rovner agrees to sell an equal amount of his stock to C. J. Rasdal, the intention being that as soon as the corporation is incorporated that all of the above named parties are to have an equal amount of stock in said corporation.

"It is further agreed by and between C. J. Rasdal that he will purchase the above described stock as above set forth, paying for same by giving his individual note to the respective parties for the amount of stock received from them and that said stock will be deposited with them as collateral security for the payment of said note. Said note to draw 6 per cent from date of execution. Said note to be dated February 18, 1930, and due three years from said date, and until the corporation is completed C. J. Rasdal is a partner to a one-third interest in said business.

"In witness whereof we have hereunto affixed our signatures the day and date above written.

"Dave Melman,
"I. Rovner,
"C. J. Rasdal."

All parties purported to pursue the business in accord with their contract. They appear to have agreed readily upon all the items of their contract. Upon the organization of the corporation, Melman was elected president and the other stockholders assigned to the other offices. They operated without friction for the period of four months. In July friction developed. It was claimed by his associates that Melman had misused some of the funds and devoted them to his own interests and not to the interest of the corporation. A meeting of the corporation was called in accord with its articles

for the date of July 15. The meeting was held, and Melman declined to attend the same. At that meeting he was removed as president, and Rovner was elected president instead. On the following day a conference was had between all the parties to the transaction wherein a mutual recital of grievances was had. The result of the conference was that their differences were composed, and they all agreed to renew their former confidence in each other subject to some restrictions. One of these was that the issuance of checks should require the signature of two of the parties. Rovner continued as president. Information had come to Rasdal and Rovner that Melman claimed to have retained the ownership of the real estate. There had been no formal transfer of Melman's equity to the corporation, except so far as such transfer might be implied as the necessary result of their contract.

At the conference of July 16, both Rasdal and Rovner advised Melman of the report that had come to them as to his claims. He denied that he had ever made such statement. In response to their demand that he state his attitude on that question, he asserted that the property belonged to the corporation. These facts were testified to by both Rasdal and Rovner, and were not denied by Melman in his testimony. From that date the parties worked together as before, and Melman drew his regular salary up to and including December 15, 1930. On that date the final rupture occurred, and this suit was brought. It is purely a suit to quiet title to the particular real estate used in the business.

By an amendment to its petition, the plaintiff set forth the contract of February 18, 1930, and asked for its reformation on the ground that it failed to express the full and true intention of the parties. It will be noted that such contract does not in specific terms refer to the real estate. It is for this purported reason that the plaintiff seeks a reformation of the contract. Concededly the contract did fail to state all the agreement of the parties. For instance, it was a part of the oral agreement that, in making up his inventory, Melman should be permitted to include "good will" of the business at a valuation of $5,000. This fact is conceded by both parties. The plaintiff is not asking escape from that obligation. If the contract as originally signed were literally enforced against Melman, he could not recover thereunder for the item of good will. The importance of this particular fact is that it does of itself establish that the contract was mistakenly drawn. It is the

attitude of Melman that the good will item was agreed on after the contract was drawn. That could be true. It may be true also that the item of $3,000 for Melman's equity in the real estate was agreed on after the contract was drawn. The really material fact is that the item of $3,000 for the equity was agreed on by all the parties in interest. The contract itself called for an agreement on the valuations. The valuations agreed on were consistent with the terms of the contract.

Melman agreed by the contract that his inventory should amount to $30,000. The inventory finally produced by Melman through the accountant mutually employed included every item of property that he had, real or personal. The total of $30,240 represented his net worth. All the items of value were agreed on. He received from the corporation a check for $240 to cover the excess of the net over and above $30,000. Under the contract he obligated himself to take $30,000 of the stock of the corporation. Rovner agreed to take an equal amount of stock. Rovner paid into the corporation the full amount of $30,000 in money. If there is any deficiency in the terms of the contract as affecting the other shareholders, it is the phrase *"including* personal property". This phrase is not necessarily exclusive of other property. If it should be deemed in the first instance as exclusive, yet it was entirely competent for the parties, in the light of the inventory taken, either to modify the contract or to put a construction upon it. The item of $3,000 for the equity was included in the inventory, and was assented to by all the interested parties. An item of $5,000 for good will was likewise included in the inventory, and likewise assented to by the parties. They should be deemed, therefore, to have construed the contract in accord with their conduct. There can be no doubt upon this record but that all parties regarded the property described in the inventory as passing to the corporation. Melman, as president, took out two insurance policies upon the buildings; one policy of fire insurance, and one of tornado insurance, and each for $5,000. He took them both in the name of the corporation, and paid the premium with the money of the corporation.

The purchase price of the realty was largely unpaid. It was payable in installments. The parties provided a "building fund" of $190 per month. The refrigeration was not wholly paid for, and installments were yet to fall due. A fund of $50 a month was provided for such payments. Melman was to draw these funds, and was

to apply them to their purpose, and a final accounting and settlement was to be had after payment had been completed. True, Melman contends that the $190 was for rent of the real estate, and that the $50 per month was a part of his salary. The evidence of the other shareholders is against him on that contention, and to our minds is worthy of more credit. When it is considered that Melman undertook to take $30,000 worth of the corporate shares and to pay for the same with $30,000 worth of property at an agreed valuation, and that $30,240 represented his complete net worth, and that he actually included all his property, real and personal, in the inventory, and that this was assented to by the other shareholders, and that in reliance thereon Rovner paid the full amount of $30,000, in cash, we see little room for controversy over the real purpose and intent of the parties in their negotiations. To say now that Melman retained the real property would be to deduct $3,000 from his inventory and to leave him indebted to the corporation for $3,000. He had bargained for no credit. Neither had Rovner. There is no dispute over the fact that Rovner paid the full amount for his shares. The first payment made by Rovner was for $3,000, and it was made before the signing of the contract. In his testimony, Melman presents conflicting contentions as to such $3,000 payment by Rovner. He first testified that he gave Rovner his note for the $3,000, and that he had never been able to get his note back. Later, he testified that Rovner loaned $3,000 to the corporation, and that the corporation was owing him such amount. This illustrates the inconsistency, which characterizes much of Melman's testimony as a witness. His defense as a whole presents a unique feature.

The record is voluminous. It discloses that the trial in the court below occupied five days. A preliminary controversy of major proportion has been presented in this court; and yet in a monetary sense the litigation does not involve one dollar of gain or loss to this defendant whether he wins or loses. It is mutually agreed that the value of the equity is $3,000. If the corporation is entitled to the property, then Melman is entitled to credit for the $3,000 as the final payment of the balance due from him for his shares of stock. On the other hand, if Melman is entitled to retain the property, then he must pay $3,000 as the balance due for such shares. The length and the breadth are equal. He has no other resources for such payment than the $3,000 credit. No financial gain or loss to him is therefore possible. The only motive behind the litigation therefore

seems to be strategic and perhaps punitive; perhaps a leverage of duress. The corporation must needs have a *locus* in which to operate. That fact was apparent from the beginning. Its equipment is fully fitted to the present location. The location is a *key* to its business. If Melman may hold the key, the corporation may be locked out of its location. In such event, its current business would necessarily be retarded, and substantial damage might accrue. In that sense the plaintiff has a substantial interest at stake; the defendant Melman has none.

Upon the record before us, we deem it quite immaterial whether the original written contract be reformed or not. The subsequent mutual conduct and understanding of the parties since their written contract was made presents a mutual interpretation thereof, and is quite controlling of the equities of the case. We deem it clear also that the contention of the corporate plaintiff as to the mutual intent and understanding of the parties must be sustained.

V. There is another feature of the case, which is rendered immaterial in view of the conclusion reached by us in the foregoing division. The fee title of the real estate was in Melman's vendor, Mrs. Doyen. Rovner purchased the fee title from her by paying the full amount due her under the contract. After acquiring the title, he served notice of forfeiture upon Melman for default in payment of installments. Melman's contract was forfeited in due form. Rovner thereupon transferred the property, fully paid for, to the corporation. The record title is therefore in the corporation. The record title thus disclosed was in no manner assailed by any affirmative pleading on the part of either defendant. They pleaded neither a cross-bill nor an affirmative defense. We reach the conclusion, however, that by the negotiations between the parties hereto the corporate plaintiff acquired the equitable ownership of the real estate subject to the rights of the vendor, Mrs. Doyen.

Whatever was added to the equitable title by the later proceeding of forfeiture we need not pass upon. That record may speak for itself.

The decree entered below is accordingly reversed.

STEVENS, C. J., and ALBERT, KINDIG, WAGNER, and MITCHELL, JJ., concur.