WILHELMINE TESSMAN, Appellant, v. EARL H. TESSMAN et ux., Appellees.

No. 45043.

APRIL 2, 1940.

REHEARING DENIED SEPTEMBER 27, 1940.

Graham & Graham and Dalton & Dalton, for appellant.

Chas. S. White, for appellees.

BLISS, J.—The plaintiff and her husband came to Audubon county from Germany, shortly after their marriage and engaged in farming. They acquired a considerable amount of property. Five children were born to them and grew to maturity. The eldest child, Mrs. Pauline Buthweg, 66 years old, a widow, lives near Audubon. Fred Tessman, a retired farmer, lives in Audubon. Each is financially well to do. Otto Tessman and wife died leaving three children, all adults, Donald, Russell and Mrs. Ellowene Burr. The second daughter, Minnie, married Charles Hershman. They live at Manning, Iowa, and have two children at home. Herman Tessman is a farmer living near Red Oak. He has one son, the defendant, Earl Tessman, who, with his wife, lives with Herman.

The plaintiff and her husband, when they retired from the farm over 15 years ago, moved to Manning and built a

home costing $8,000. A little later they gave this home to Mrs. Hershman, reserving to themselves the life use of a room. The plaintiff's husband died about 1926 and she continued to live in her daughter's home in Manning. The plaintiff and her husband had been generous with all of their children in property matters, and the plaintiff continued the generosity after her husband's death. In 1925 they deeded a farm of approximately 240 acres to Herman for $8,000. It was worth more than this amount. There is some dispute as to whether he paid the father this sum. Later he lost this farm and also another farm, which he had bought. The parents also sold a 200-acre farm to Otto. He was unable to pay the purchase money mortgage, and after his death it was reconveyed to the plaintiff. Otto had signed notes approximating $20,000 for his brother Herman, which left his estate insolvent. In addition to the gift of the home to Mrs. Hershman, there was substantial evidence that the plaintiff had paid $3,500 to settle an automobile damage liability of Mr. Hershman, the further sum of $1,700 to settle a claim against him, and the sum of $2,000 from insurance after the father's death. There was evidence that they had received considerable from the plaintiff's income while she lived in their home. There was evidence that the other children had received substantial sums. Herman received about $1,100 when his parents went to California, $200 to apply on the purchase of a binder, $100 on an automobile and $45 on a washing machine. The defendant Earl Tessman received $300 when he attended business college. Mrs. Buthweg and Fred each received $1,000 from insurance money, and the latter also received $3,500 from his mother. He owned 360 acres of land and Mrs. Buthweg a half section. Both farms were unencumbered. Mrs. Buthweg had told the plaintiff that she did not care for any more land.

In July 1936 the plaintiff had a quarrel with Mr. and Mrs. Hershman, and had her grandson, Donald Tessman, come for her. He took her to Mrs. Buthweg's home, and they took her to the home of Herman. She lived in his home, except for visits with other relatives, until May 30, 1938. On August

2, 1937, the plaintiff went alone to the office of Douglas Rogers, a lawyer at Manning, and there executed a will. By it she bequeathed $3,000 to Mrs. Buthweg, $1,500 to each of Otto's three children, and to Mrs. Hershman's two children. All the rest of her property, real and personal, she gave to her grandson, the defendant. Earl Tessman, but incorrectly named him as "Albert". With respect to Herman Tessman, Fred Tessman, and Minnie Hershman she stated in the will that each having received "substantial advancement from me I therefore do not bequeath them or either of them anything." Rogers' secretary was named as executrix, and the will was left with Rogers. Upon returning to her home at Herman's she told him and Earl of making the will and stated that she was afraid she had given away more money than she had, and that she had made a mistake in Earl's name. She and Herman and Earl then called upon a Mr. Spicer, an insurance man at Red Oak, with whom Herman had done some business, and who occasionally prepared wills, and she told of the will she had made, and that she was afraid she had given away more money than she had, and that she had made a mistake in a name in the will, and she thought there might be trouble over it. The plaintiff could neither read nor write English, and spoke it with difficulty. Spicer had a smattering of German. He understood her, but told her she should see a lawyer. He recommended Leroy H. Johnson, a fellow Rotarian, and a good friend of his. Spicer took them all to Johnson's office and introduced them. He remained while she re-explained the matter to Johnson, and told him how she wished the will drawn. She told him that instead of having $10,500 as provided in the Rogers' will, she thought she had but $6,000. Johnson could not talk German but he could get her meaning. He told her it would be better if she obtained the Rogers' will and brought it to him, and he could more clearly understand what changes she wished to make. She also asked him if she could give a deed to 160 acres of land and still have the rentals as long as she lived. On August 11, 1937, she returned to Rogers' office and was given the will. That

afternoon or the next morning, she and Earl returned to his office, and, according to Rogers, the plaintiff stated that Earl was not satisfied with the will, and wished a deed to the property. Earl denies this. The plaintiff then asked Rogers to redraw the will and he refused. Some mention was made of her mental competency and she stated that she had heard that Minnie had said that she was too old to look after her property, and that someone should do it for her, and that she had heard that Fred had said the same thing. She testified that this did not make her mad, but that on that day, August 11, 1937, she went to two doctors, one of whom could talk German, and she testified that they each laughingly told her that she was "okay" and that she was competent to look after her affairs, and each gave her a certificate to that effect.

On August 12, 1937, she and Herman and Earl returned to Johnson's office, and a will was prepared giving $3,000 to Mrs. Buthweg, $500 each to Otto's three children, $1,000 to Herman, $500 to Earl, and all of the residuary estate, real and personal, was given to Earl. There were bequests of $5 each to Fred Tessman and Minnie Hershman, with the statement that she had already "dealt fairly with them." The will was witnessed before attorneys Clifford Powell and Johnson. Spicer was named as executor. She also executed a warranty deed conveying 160 acres of land to Earl Tessman. She explained to Johnson that she wished her son Herman to have this land, but since he was badly involved in debt, she was afraid it might be taken from him, and she was deeding it to his son. The deed reserved in the grantor all rents, income and use of the farm during her lifetime. Johnson explained each instrument to her but told her that he would hold both of them until she could come in and have some one who could speak German explain each instrument fully to her. Accordingly on September 7, 1937, she and Herman and Earl came in and Mr. Johnson had Mr. Pogge, a German tailor, come and read the will and deed to her. He read each paragraph and then explained it to her in German. Pogge was a witness and testified that plaintiff said that she under-

stood each instrument, and that they were as she wished them to be. The plaintiff also testified that Pogge explained them to her and she told him that the will was alright, and that the 40 acres she could sell and the 160 acres after her death would go to Herman. She instructed Johnson to file the will with the clerk of the court, which he did. Later Herman wished to have $1,000 advanced to him, and she sent Mr. Johnson to Manning to find out about her mortgage of $6,000, at a bank there. Johnson testified that the banker told him that a mortgage of $6,000 had been assigned to Mrs. Hershman, and that it had been refinanced and Federal Farm Mortgage bonds had been issued in place thereof, in the name of Minnie Hershman, and that she was receiving the interest from those bonds. There was no denial of this testimony. When Johnson told the plaintiff of this fact she asked him to draw a codicil to her will eliminating the specific bequests therein, aggregating $6,000. She executed such a codicil on January 8, 1938. The witnesses were Johnson and Attorney Clifford Powell. The plaintiff testified that at the time the will and the deed to the 160 acres were executed, she asked whether she could sell the remaining 40 acres, and was told that she could sell it if she wished to. She further testified that she had asked Herman to sell it, and he had tried to and could not. The plaintiff testified through an interpreter. This examination then took place:

"Mr. White: And you knew too during that period of time it was very hard to sell any land in Audubon County at anything like a decent price?

"The Witness: Yes, she knew that land was depreciating and she couldn't sell it for the price it should bring.

"Q. Then some time after that Herman had failed to sell this forty, and she had concluded it couldn't be sold at anything like a decent price, she had a talk with the folks, and by they I mean Herman and perhaps Earl, and told them that she believed she would take and deed this forty acres to Earl and retain the rents and profits of it so long as she lived.

A. Yes, that is correct that she made the statement she would probably deed that land to Earl and retain the rents from the land as long as she lived."

On April 1, 1938, she and Herman and Earl went to Johnson's office and she told him that she wished to deed the 40 acres to Earl, and to retain for herself the rents, profits, and income during her life, upon condition that, within one year after her death, Earl should pay $1,000 to Mrs. Buthweg. A contract to this effect was, at this time, executed by the plaintiff and Earl, in duplicate, and one was given to plaintiff. She testified:

"That is my signature attached to Exhibit 7, the deed to the forty acres; and that is my signature to Exhibit 10, which is the contract entered into with Earl Tessman, on April 1, 1938, relating to the transfer of this forty acres."

Mrs. Buthweg testified that her mother told her that she had given Earl the 160 acres of land, and that her mother also told her that when she told her son Fred about the giving of this deed, he was not pleased, and she said to him:

"Well I was alright and knew what I was doing, and if I ever wasn't alright in my head it was the time I gave you the $3500."

On Memorial Day, 1938, she had Earl take her to the cemetery at Manning to place flowers on her husband's grave. She then went to Mrs. Hershman's home and has lived there since.

On May 31, 1938, Earl placed both of his deeds on record. His only explanation of the delay in recording was that he had asked Johnson about recording them, and the latter had told him that he might record them at any time. Rogers testified that the plaintiff and Mrs. Hershman came to his office in July 1938 and they told him of the deeds, and the plaintiff asked him what she could do about it, and he told her to bring an action to cancel them. Rogers then began this action. Later he withdrew as an attorney. Johnson was

also associated as an attorney for the defense, with Chas. S. White, but Johnson later withdrew.

I. The principles of law involved in litigation of this kind have many times been stated by the court, and a repetition of those principles is unnecessary. Similar cases have recently been before us. See Tedemandson v. Morris, 227 Iowa 774, 289 N. W. 1; O'Brien v. Stoneman, 227 Iowa 389, 288 N. W. 447; Merritt v. Easterly, 226 Iowa 514, 284 N. W. 397, and cases cited therein. Attorneys for the appellant urge that Herman Tessman and his son collaborated with Johnson, Spicer, and Pogge to take advantage of the grantor. Because of some conflicts in the testimony, the interest and the attitude of the various witnesses, this is a case in which we should put much reliance in the findings and judgment of the trial court. In the judgment and decree, the trial court fully and fairly reviews the claims of the parties and the evidence offered and finds that there is no substantial support for the appellant's claims. While the appellant was about 88 years old, there is no claim that she was mentally unsound. The record very clearly indicates to the contrary. This is not a case where there was either a fiduciary or a confidential relationship between the appellant and Herman and Earl. She looked after her own business. Her tenant on the 200 acres testified that she talked over the farm business with him and attended to it. One of Otto's children testified that on her frequent visits to him while she was living with Herman, she would slip away from the house and walk a mile down to her farm at different times. She attended to paying her taxes. When her corn was shelled in the spring of 1938 she attended to it and received the check from the purchaser of the corn. While Herman or Earl or other grandchildren would drive her about, there is no evidence that any of them ever advised her or transacted any business for her. She was not without independent advice in the deed transactions. Johnson was her own lawyer, and he held up the delivery of the deeds until he called in Pogge to make certain that she understood each transaction. She talked with her other children about it. The first deed was

executed on August 12, 1937, and she visited with many of her children and grandchildren thereafter. It clearly appears that she at all times wished Herman to have the 200 acres. Earl lived with Herman, and she gave the land to him only because she thought that was the best way to protect Herman. In the will which she executed, unattended in Rogers' office, she made Earl her residuary legatee.

The trial court found:

"The plaintiff has stated many times that all she desired was the income from the land conveyed by the controverted deeds. She likewise stated that she wanted Herman, father of defendant, to have the farms, but that because of his debts he could not hold property, and that by reason of that fact she was going to give it to his only child. While there is evidence that her son Herman was with her at the various times she made trips to the office of Attorney Johnson, yet there is no evidence that he was urging her to make the transfers. The evidence does show, and much of it comes from witnesses who are not interested in the case, that plaintiff was fully advised as to each step taken in making the deeds in question; that before they were delivered they were fully and fairly explained to her in her own language and that she stated that she understood them and that they were as she wanted them. Over a year had elapsed following her leaving the home of her daughter Minnie in Manning until the first deed was given; and the evidence shows that during that time plaintiff visited with other of her relatives and had opportunity to confer with them. The evidence further shows that by said deeds plaintiff kept the life income from the two hundred acres and that in addition required the grantee, Earl H. Tessman, to pay to Mrs. Buthweg one thousand dollars within a year following the death of plaintiff.

"After fully and carefully reviewing the evidence and considering the same in the light of the law as laid down by the higher court, this court is of the opinion that the evidence offered by the plaintiff does not substantiate her claim. The

court is of the opinion that such testimony, and especially that of plaintiff, to some extent supports and corroborates the testimony of the defendant. Plaintiff told others what she intended to do and later told others what she had done. Up to the time she returned to the home of her daughter, Minnie, at Manning she had expressed no dissatisfaction with her acts. Taking into consideration the past relationships of plaintiff and her said daughter Minnie and the nature and extent of the property which said daughter and her husband had previously secured from plaintiff, the court is of the opinion that the influence and attitude of said daughter had much bearing upon the present claims of plaintiff."

These findings have ample support in the record. It is particularly significant that Mrs. Buthweg, who displayed little inclination to unfairly take anything from her mother, was a witness for the defendants. Fred Tessman, Russell Tessman, and Mrs. Burr, while they were witnesses for the plaintiff, they gave no evidence which aided her. There is much in the record to support the trial court's conclusion as to the moving spirit of the prosecution.

II. Appellant filed an abstract of 118 pages. Appellees denied its correctness and filed an amendment thereto of 35 pages specifically correcting and amplifying parts of the direct and cross-examination of 13 or more witnesses. The appellant denies this amendment generally, and has certified the files, and the transcript of testimony, containing 398 pages, "which she asks this court to examine in passing on the issues of this case." Rule 17 of this court requires appellee's denial of appellant's abstract to be specific, and his amendment to set out so much of the record as he deems necessary to correct or to amplify the abstract. If the appellant is not content with this amendment, he should deny it and certify the record, or such parts as he deems necessary, to this court. His denial should not be a general, blanket denial, but should also be specific, and should point out the parts of appellee's amended abstract, of which he complains, and he should further point

out and specify, by page, or otherwise, the parts of the record or transcript, which support his denial and complaint. If this is done the court will have little difficulty in turning to that part of the certified record which bears on the dispute. If it is not done a reading of the transcript or a long search through it is necessary. The burden should not be put upon the court of reading the abstracts and the amendments and also the entire transcript and other certified records. It is to be borne in mind that, except in the instance of exhibits certified for inspection, the record and the transcript are not certified to us to be completely read, but only for the purpose of settling disputes developed in the abstracts and amendments thereto. Palmer v. Clark, 114 Iowa 558, 87 N. W. 502; Hoyt v. Beach, (Iowa), 85 N. W. 755; Harness v. Tehel, 221 Iowa 403, 263 N. W. 843; Melman Fruit Co. v. Melman, 216 Iowa 45, 245 N. W. 743; Chicago & N. W. Ry. v. Sioux City Stockyards Co., 176 Iowa 659, 661, 158 N. W. 769; Pullan v. Struthers, 201 Iowa 709, 207 N. W. 794. As stated in Melman Fruit Co. v. Melman, supra [216 Iowa 45, 50, 245 N. W. 743, 745]:

"The only function which a transcript serves in this court is as an arbiter between two conflicting abstracts. Where the contentions of the litigants differ as to the state of the record, we refer to the transcript to discover which is right and which is wrong. When we determine that dispute, the function of the transcript is performed. We must read the case from the abstracts and not from the transcript."

In Chicago & N. W. Ry. v. Sioux City Stockyards Co., supra, we said, on page 673 of 176 Iowa, 774 of 158 N. W.:

"The certification, if required, must necessarily be sufficiently specific, and no more so than to cover the denial. * * * The only object of certification is to settle the specific dispute raised by a denial; * * *".

In Palmer v. Clark, supra [114 Iowa 558, 559, 87 N. W. 502], the court said:

"* * * all the evidence to be considered by this court must be included in the abstracts."

In Hoyt v. Beach, supra, page 755 of 85 N. W., we said:

"Resort is to be had to the transcript, not to supply omissions in the abstracts, but to settle disputes with respect to the record. * * * *Were it otherwise, litigants might, at their option, compel the court in any case to use the transcript alone, rather than the printed abstracts, as contemplated by law.*" (Italics ours.)

It is our conclusion that the judgment and decree appealed from is right, and it is therefore affirmed.—Affirmed.

HAMILTON, C. J., and HALE, SAGER, STIGER, OLIVER, MILLER, and MITCHELL, JJ., concur.