J. F. STAUFFER, Trustee, Appellant, v. IVA G. MILNER et al., Appellees.

FEBRUARY 12, 1929.

W. R. *Watsabaugh* and R. S. *Milner,* for appellant.

*Johnson, Donnelly & Lynch* and C. J. *Haas,* for Iva G. Milner, J. A. Milner, and George W. Toms, Guardian, appellees.

*G. P. Linville,* for Hubert Dean Jones, appellee.

EVANS, J.—The grantor in the deeds herein assailed, was John Henry Jones, now deceased, and formerly of Linn County.

He died on January 2, 1922, intestate, and left surviving him his two sons, Willard Jones and Hubert Dean Jones, and his two daughters, Mrs. Iva Milner and Mrs. Edith Keating. Iva Milner is the principal defendant herein. She is the grantee in the deeds assailed. The defendant Joe Milner is her husband, who has been joined with her. The deeds under attack were executed February 24, 1920. One deed purported to convey to the daughter Iva Milner, and to the son Hubert Dean Jones, the grantor's farm of 120 acres situated in Linn County, Iowa. The other deed purported to convey to the same grantees certain lands in Kansas. For the convenience of discussion, we shall refer only to the Linn County farm. In each deed, reservation of a life estate was made by the grantor. This suit is prosecuted on behalf of the son Willard, who conveyed his interest in his father's estate in trust to the plaintiff herein. A like suit was brought by the daughter Edith Keating, which was prosecuted to judgment, resulting in the dismissal of her petition. The son Hubert Dean Jones was a minor at the time of the conveyances, and had nothing to do with the transaction. He appeared in the action as a defendant, and filed an answer, conceding the equity of plaintiff's claim, and rejecting all unequal benefits to himself by virtue of the conveyances, and tendering quitclaim deeds to his brother and sister Edith, to such excess as had been conveyed to him over and above his one-fourth share.

The theory upon which the plaintiff prosecutes this action may be divided into three general propositions: (1) That the grantor, Jones, was unsound or weak in mind, and that the defendants acquired dominance over him, as such, whereby they procured the conveyances by undue influence; (2) that they sustained a fiduciary relation towards the grantor, and that, while sustaining such relation, they obtained from him his property, without consideration; (3) that the defendants deceived the grantor by false promises to the effect that they would hold the title of his property in trust, and that they would convey it back to him upon request, and that, in reliance upon such false promises and inducements, the grantor conveyed his property, without consideration. It will be readily observable that the last ground stated can be of little avail to the plaintiff unless he has established one or both of the first two grounds stated. Unless the grantor was under some degree of disability mentally, or

unless such a fiduciary relation existed as rendered the transaction presumptively voidable, the third ground would be fully met by the statute of frauds. Under this statute, an oral promise to declare a trust or to receive a conveyance in trust would not be provable. Nor could the statute be circumvented by alleging such oral promise as a false representation. We proceed, therefore, to a consideration of the evidence and the circumstances under which the conveyances in question were made.

John Henry Jones, the grantor, was a farmer, who had spent his life in Linn County, and his mature years upon a farm located near Center Point in Linn County. Upon this farm he reared his family. In 1916, his wife died. At that time, his three oldest children were married, and out of the nest. Hubert was a boy in his teens. After the death of his wife, the grantor continued to operate his farm until the year 1919, when he rented it to a nephew. He employed housekeepers during the period of his occupancy of the farm. One of these was Mrs. Yates, a young woman in her early twenties, whose husband was in the army. Upon the return of the husband, in 1919, he brought a suit for damages against Jones for $25,000, for alienation of affection of his wife. The pendency of this action caused Jones much worry. On February 16, 1920, this suit was settled, and a dismissal thereof was entered on the following day. On February 24, 1920, he came alone to the office of his attorney, and directed him to prepare the conveyances now under attack, and to have the same ready for him by the following day. On the following day, he returned, accompanied by his son-in-law, Joe Milner, and executed the conveyances before his attorney as a notary. After execution, he handed the same to his son-in-law, with the direction that he give them to Iva. The son-in-law, however, left them in the hands of the attorney. Milner had been active in his efforts to bring about a settlement of the alienation suit. Jones had put into Milner's hands the sum of $7,000, for the purpose of such settlement, and the same was delivered by Milner to Jones's attorney. The amount actually received by Yates out of this settlement was $300. Later reference will be made to this circumstance. On March 1, 1920, Jones was married to Mrs. Yates,—a divorce having resulted in the meantime, as between her and Yates. After the marriage, the parties thereto moved upon the farm. Some months later, a

storm area developed in the married life of the couple, and this became the occasion of an affidavit made by Jones, which has figured significantly in the present litigation. Evidence was introduced by the plaintiff, tending to show that certain changes had come over Jones after the death of his wife. This testimony was given mainly by his brothers and brother-in-law. The brother-in-law testified as follows:

"With reference to John Henry Jones's business affairs and the method of carrying on business prior to my sister's death, he was pretty close,—rather a close dealer,—in his actions and business dealings and the way he talked. After my sister died, he seemed to be a good deal freer with his money, and seemed quite hilarious at times, and seemed to be having quite a good time,—altogether different from what he was before. After my sister's death, Mr. Jones went everywhere, and ran around a good many places, and didn't stick close to his business; and he bought a new car, and used that a while, and bought another nice new car, and didn't pay much attention to his farm work, and didn't do any, but kind of a half-hearted manner, as though that was the last thing in life,—farming. Before my sister's death, he stuck very closely to business, and did his farming good, and was right up with his work. After my sister had died, he had a good deal of trouble with his housekeepers,—that is, getting them, and so on,—quite a little trouble with his domestic help. He seemed getting first one and then another to work for him, and it seemed they could not stay all the time, and he had to change, and it seemed he had a good deal of trouble, in telling of it, anyway. * * *"

Cross-examination.

"It was while he was a widower that he began to step out and run around a little more than he did while his wife was living, and during that time, he had an automobile or two. He had a stroke or something that took him off, and his death was sudden. Up to that time, he appeared to be going all the time, but complained a little of not feeling just right, and he looked about the same as he looked for a good many years. So far as I know, he had been looking after his own business. The change I noticed in him was that he did not stick quite as close to work as he did before his first wife died. His first wife seemed to have a

strong controlling influence over him. After her death, he began to dress a little better than he did before, and had the appearance of kind of stepping out, as we say up there."

The brother, W. W. Jones, testified:

"Up to the time my brother John Henry Jones's first wife died, he was very shrewd, and attended well to his business. After his first wife died, and down to a short time before his death, he became pretty slack and reckless,—that is, he spent his money very free, and didn't attend to his farm well. He was more wandering in his talk, and wouldn't carry on a subject very long. I know of the domestic difficulties and troubles with housekeepers he had, following his wife's death. I remember one time when he left the farm, and came to live with his daughter Iva Milner. I recollect of a suit, being commenced against him by the husband of his housekeeper. I had a conversation with him about this time concerning his lawsuit. In this conversation he appeared to be considerably worried. He told me that he thought they were all going to beat him out of a lot of money, and he appeared to be excited and worried. At some of these times, he came to me for advice, but would not follow it when I gave it to him. At this particular time, he was discussing his troubles and affairs, and seeking advice of almost all his friends. * * *"

### Cross-examination.

"All I know about his lawsuit is what he told me, or what someone else told me. He seemed to worry about the same as anybody else would that had a $25,000 suit against them. Before his wife died, he stayed at home, and worked well, and after his wife died, he began to dress up and go out, and bought an automobile, which he did not have while his wife lived. His first wife died along about 1917. After his second marriage, he moved back on the farm. While he was a widower, he managed his own business, and didn't listen to anybody, and did as he saw fit in these respects."

The foregoing is sufficiently illustrative of the evidence on that question. During the year 1919, when his farm was occupied by his nephew, Jones boarded with his daughter Iva for several months. During this period of time, he sold another

farm, of 93 acres. Of this transaction, $6,000 in cash came into his hands, which he deposited in the bank in the name of his son-in-law, Joe Milner. He checked on this account, signing the name of his son-in-law, by himself, as agent. He also gave to his daughter Iva $2,000, which she used to pay off a mortgage on the farm already conveyed to her. The net result of the property transactions of Jones was that, at the time of his marriage to his second wife, March 1, 1920, he held a life estate in his former farm, and his daughter held the legal title to the remainder, subject to such life estate. He had an account at the bank in the name of his son-in-law, upon which he drew checks, as purported agent of his son-in-law. Following a quarrel between himself and his second wife, he called upon his attorney, on November 8, 1920. As a result of his consultation with his attorney, he then and there executed the following affidavit:

"I, J. H. Jones, of Linn County, Iowa, being first duly sworn on oath do say, that I am the father of Iva G. Milner, wife of Joseph Milner of Marion, Iowa. That during many years last past, I have had a great deal of serious and embarrassing trouble of various kinds and have at such times been in need of assistance, such as my said daughter and her husband, Joseph Milner, could render, and they and they only could do so. That in all said sorrows and trouble it was upon them and upon them alone that I felt that I could safely rely for assistance and encouragement, and the same have at all times been willingly given and rendered. That I have been involved in serious litigation growing out of domestic troubles and charges, the said charges having been made against me from purely mercenary motives and purposes, and wholly without cause and for the purpose of defrauding me out of money and property, wrongfully and by blackmail, as I then felt, and still believe.

"That in all said difficulties and in defending against all said wrongful and malicious charges, the assistance of my said son-in-law, Joseph Milner, along financial lines and matters in the adjustment of such difficulties, has been most valuable. That in the adjustment of all said matters and for that purpose and end, and owing to the business experience and sound judgment of my said son-in-law, I have placed money in his hands with which to adjust and settle the said suits, difficulties and embarrassments, and the same has been fully and satisfactorily in all

respects and matters accounted for and expended under my direction, advice and consent, and with my full approval in all matters, and that all said funds have been paid out to the parties receiving the same, and in the amounts so paid and received, to my full and complete satisfaction and as directed by me to my said son-in-law so to do, and I hereby again state that I approve all said payments, and of all appropriation and use of all said moneys and funds, and I feel that my said son-in-law has not been overpaid and has fully and satisfactorily accounted for all said money and funds so received by him and I again ratify and approve all his said acts in relation to the said disbursements of all said funds, and this I state is a receipt to him for the same in full. And I further state that the said son-in-law, Joseph Milner, is not in any manner indebted to me therefor, or in any manner whatever or for any other sum or amount whatever.

"I further state and say that knowing, as I felt, that the use and income of the certain lands that I owned in this and other states, was sufficient for my support and maintenance, before my marriage with my present wife, Elsie Jones, and with her knowledge and consent, I transferred to my children my lands, subject to my life estate, and caused the deeds therefor to be made, and delivered the said deeds to the grantees named therein for the purposes of transfer and delivery, so that the same could by them be placed of record in the several states and counties wherein the said lands so conveyed are situated. That the said transfers were made in the utmost good faith, and solely for the purpose stated and named above. That the fact of the making and execution of the said deeds was made known to my said wife, Elsie Jones, at the time of our marriage and has been talked over between us many times after said marriage and up to the time of our having our first trouble or domestic discord. The said wife, Elsie Jones, was fully advised of the fact of such transfer of the legal title, and of the further fact that it was done in pursuance of a former family agreement and understanding touching the same and to carry out said agreement and understanding.

"That on account of the said transfer of the legal title to said lands to the grantees in said deeds, my said wife has repeatedly refused to agree to go with me to and upon the said lands, and use and enjoy the said life estate, and so still refused up to the present time. That I have at all times been fully con-

tent with the arrangement made between me and my children with reference to the making of the said deeds and the arrangement made and stated therein, and now fully ratify the same in all respects, believing at the time and at all times since then up to the present time, that the arrangement and agreement so made and carried out is just in all respects.

"I further state that owing to the bitterness and cruelty of my said wife I feel that I am not warranted in attempting to longer live with her or in the same house with her, and that she has forbid me to enter the said former home, and demanded that I take and remove all of my personal effects from the said so-called home.

"J. H. Jones."

The after-events of the marital life following the making of the foregoing affidavit are not disclosed in the record. The implications of the record are that marital relations continued throughout the rest of Jones's life. After his death, the wife became the administratrix of the estate. She also asserted her right to dower in the property covered by the conveyances now under attack. Her rights were recognized by a compromise, under which she received $5,500. So far as appears, Jones lived a normal life, and transacted his own business in a normal way, for the fourteen months of his life following the making of the affidavit.

Upon the evidence set forth in this record, we should not be justified in finding that Jones was at any time mentally incompetent to transact his own business; or in finding that the defendants gained any undue control over his will, as a result of his mental weakness, or otherwise; or in finding that he had surrendered to them the control of his business in such a way as to establish a fiduciary relation, within the meaning of the law. His worry over the lawsuit was in no sense abnormal. He had employed an attorney. He acted under the advice of his attorney, and through his attorney. The fact that the son-in-law was also worried over the lawsuit, and interested himself in obtaining a settlement of it, was natural and legitimate. He did not thereby assume a fiduciary relation. The conveyances were made after the settlement of the suit. The preparation of the deed was directed by Jones to his attorney, and in the absence

of the defendant. The same thing is true of the affidavit above set forth.

In the absence of a showing of mental disability or weakness, or of fiduciary relation, the plaintiff has little standing ground. Just why the conveyances were made, is not well disclosed in the record. It is urged by the appellant that the burden was upon the defendants to explain the purpose of the deed. This would be so only if mental disability or fiduciary relation had been shown. It is urged also that there was no consideration. This of itself is not a ground for setting aside the deed. It was competent for the grantor to make a gift of his property. Want of consideration would be a good defense to an executory contract. But a deed is not such. It represents a contract executed, and a conveyance fully accomplished. True, the want of consideration is a circumstance, and often a significant one, as bearing upon the validity of the conveyance. But in the absence of mental impairment or fiduciary relation, it loses much of its significance. If he had named all his children as grantees in the conveyances, no one would have supported him in questioning their validity during his lifetime. But he named the grantees, and was not lacking in capacity so to do. We must look at the case as it was in his lifetime. Could he have challenged these conveyances in his lifetime? He could have been completely refuted by his own affidavit. Nor would the affidavit have been essential to a good defense against him. If it should be wholly disregarded, the record discloses no ground of attack which would have been available to Jones himself in his lifetime. Though the reasons for the conveyances are not directly disclosed, it would be difficult to avoid the natural inference that the conveyances were made in contemplation of his marriage, and in order to avoid possible alimony or a future distributive share in his estate. He was 52 years of age at the time of the marriage. His wife was 26 or 27. She testified that she was 33 years old at the time of the trial, in 1926. She was due to outlive him. That he was not expecting a reconveyance of the property is indicated by the fact that one of the grantees named by him was a boy 17 years of age. It is quite possibly true that he trusted the grantees implicitly, and believed that they would award to the other children their proper share. It is doubtless true also that Iva, as indicated by her correspondence, deemed

herself and younger brother trustees for the other brother and sister, and that she intended to observe the moral obligation of the golden rule, and to claim for herself only a child's share. The younger brother has signalized himself by responding to the moral call. But our jurisdiction does not extend to that field. That field is within a higher jurisdiction than ours, wherein, perhaps, all lawsuits shall be tried again. Sufficient to say that the strong call of this case is that of the golden rule. Regret it as we may, it is not available as a ground of attack upon these conveyances.

Considerable stress has been made in argument upon the circumstance that the settlement of the alienation suit cost Jones approximately $7,000, whereas Yates, the plaintiff therein, received only $300. No relief is asked at this point, but the circumstance itself is urged as significant of fraud on the part of the son-in-law. The evidence bearing on this circumstance is very slight, and little attention seems to have been given to it in the taking of testimony. The present emphasis of the argument is hardly warranted by the slight attention given to the subject in the evidence. Both the attorney for Yates and the attorney for Jones were examined as witnesses. Each testified very indefinitely. It appears that Jones gave his own note to his attorney for $7,000 on the day of the settlement, and that this was canceled on the following day. We assume that the cancellation was by payment. The claim of plaintiff is that the son-in-law, Milner, received the balance of such money back from Jones's attorney. He testified that he received none of it. Jones's attorney was interrogated on this subject by the plaintiff. His testimony is set forth in appellant's abstract as follows:

"He didn't mention the amount, but it was quite a large sum, I know,—I would say, some $5,000 or $6,000. I think that money was retained by Mr. Milner, excepting *the amount that went to my firm as attorney's fees* and the amount that was paid to Yates *and his attorneys* as settlement."

The attorney for Yates was interrogated by plaintiff as follows:

"I will ask you if you know what amount was *received by the plaintiff* in settlement of the case. A. Yes, sir. Q. What amount was received? A. $300."

The foregoing is all the testimony in the record. It will be noted that the attorney of Jones testified quite indefinitely to the application of the money, (1) to the payment of his own fees, (2) to the payment of Yates, (3) to the payment of Yates's attorney. It will be noted also that the examination of Yates's attorney was quite perfunctory, and was confined to the query of what amount was "received by the plaintiff."

If, at the time of such examination, the plaintiff had intended to stress this circumstance to the extent which he has done in his argument here, he should have inquired from these witnesses what the amounts of their attorney fees were. The record, as he chose to make it, will not bear the stress of his argument.

It is our conclusion that the grantor in his lifetime effectually closed the door against himself as to any right of redress against the conveyances made by him, and that the plaintiff, as his heir, however innocent, is legally helpless to avoid the situation thus created.

The decree below is, accordingly,—*Affirmed.*

All the justices concur.