R. J. O'BRIEN, Executor, Plaintiff, Appellee, v. A. H. STONEMAN et al., Defendants, Appellants; ALBERT ALLEN, Co-executor, Additional Defendant.

No. 44948.

NOVEMBER 14, 1939.

REHEARING DENIED MARCH 16, 1940.

O'Brien, Molloy & Kremer, and McCoy & Beecher, for appellee.

Otto L. Schluter and Cherny & Cherny, for appellants.

HAMILTON, J.— In approaching the solution of the question involved in this case, we start with the fundamental principle that under ordinary circumstances, one has the absolute right to dispose of his property as he pleases. It is not the business of the courts to interfere with the disposition an aged person makes of her property.

 The questions are: Was she competent and did she exercise her own free will? The transaction here was between a stepmother and her stepson and the case turns on the sole question of whether or not there existed between them what is known in the law as confidential relations. The burden is upon the plaintiff to establish the existence of this relationship. The leading case in this state is Curtis v. Armagast, 158 Iowa 507, 520, 138 N. W. 873, 878, wherein the rule is laid down that, as between persons occupying confidential relations:

" * * * a contract by which the one having the advantage of position profits at the expense of the other will be held presumptively fraudulent and voidable, and the burden is placed upon him who claims the benefits thereof to *rebut* that presumption by an affirmative showing that such contract was fairly procured without undue influence or other circumstance tending to impeach its fairness. Though strictly of differing signification, the phrases 'fiduciary relations' and 'confidential relations' are ordinarily used as convertible terms and have reference to any relationship of blood, business, friendship, or association in which the parties repose *special* trust and confidence in each other and are in a position to have and exercise, or do have and exercise, influence over each other. The rule or presumption to which we have referred is more particularly applicable where one of the parties to such relation has by reason of his stronger character, greater ability, and wider experience, or by his hold upon the affection, trust, and confidence of the other, obtained a *dominating* influence over him. The relationship of principal and agent, attorney and client, parent and child, guardian and ward, is frequently mentioned as illustrative examples, but fiduciary or confidential relations may exist under a great variety of circumstances. Mr. Pomeroy states the general proposition as follows: 'The doctrine arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions

between the parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, *equity raises a presumption* against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites and of *thereby overcoming the presumption.*' 2 Pomeroy, Eq. 3d Ed., section 956. * * *

''While the relation of parent and child is nearly always given as an illustration of confidential relations, *it does not follow that all* transactions between persons occupying that relation are presumptively invalid. Indeed, it may be said that as a general rule the conferring of benefits by a parent upon a child is *presumptively valid.* The unfavorable presumption arises only where the child, by reason of its youth and inexperience or other special circumstances, is to some degree under the dominion, control or paramount influence of the parent, or where the child is the dominant personage in that relationship and the parent has become the dependent one, *trusting herself and her interests to his advice and guidance.* (Citing long list of cases.)

''This is in no manner inconsistent with the undoubted right of parents to dispose of their estate as they may think best. * * * *No presumption of fraud or undue influence arises from the mere fact that a mother exercises such right, or that she has preferred one child and left another unprovided for*; but when, in addition to such conveyance, under such circumstances it appears that she was at the time *wholly dependent upon the grantee for advice, residing in his home and placing in his hands the management and control of all her business interests, and in all things manifesting her implicit confidence and trust in him*, the taking of a conveyance *of substantially all* her estate *without consideration* and *without any writing binding* him to support her through life, *there is a presumption* of undue influence *which equity* will require the beneficiary of the transaction *to rebut* before his claim to title thus secured can be sustained against an attack by the grantor or by those who succeed to her rights.'' (Italics ours)

In the case of Utterback v. Hollingsworth, 208 Iowa 300,

302, 225 N. W. 419, 421, the court, speaking of this doctrine, said:

"*Before* the doctrine can be applied, however, *the existence of the confidential relationship* or the facts giving rise to it *must be proved.* The relationship must be such as to enable the one charged with having abused it to have exercised it to his advantage. It *must* appear *expressly* or *by implication* that *trust or confidence was reposed.* The supposed trustee must be shown to have been in a position of advantage or superiority such as to imply dominating influence over the cestui." (Citing cases) (Italics ours.)

■ The question before us, in the instant case, is: Are the facts such as to bring into play the foregoing legal principle? The charge is mental incompetency, and undue influence coupled with a claim of the existence of confidential relations. The trial court held that, if the case were to be decided upon the mental capacity of Isabel Stoneman, the plaintiff would fail because the evidence was not such as to convince the court of any mental unsoundness or weakness which in and of itself would justify the setting aside of the deed and assignment. And, also, found, that if the result should depend upon the proof directly of any undue influence exerted by defendants, plaintiff must fail. However, the court held that the plaintiff had established the existence of confidential relations and, hence, the burden was cast upon the defendants to establish the absence of undue influence and a consideration for the deed and assignment and in this the defendants had failed.

There were two separate independent transactions involved. The petition is in two counts, each stating an entirely distinct and separate cause of action. Count I involves the deed to a residence property in the town of Winthrop which was the home of the grantor. Count II involves the assignment of a $2,000 mortgage. The deed was executed March 17, 1936. The assignment was executed May 17, 1937. The record is quite voluminous, the transcript containing more than 500 pages. We have carefully read and considered the evidence and have reached the conclusion that the evidence does not warrant a finding of confidential relations at the time the deed was executed. There is nothing to sustain the claim of confidential relations other than the facts that the grantor had reached

the advanced age of 85 years; that she was grantee's stepmother; that there existed between them, at the time of the execution of the deed, the ordinary, friendly and amicable relations that ordinarily exist between a mother and son; that they visited together at the grantor's home sometimes once a week and sometimes only once in two or three weeks and that the son assisted his stepmother a few times in securing attendants to stay with her, all of which amounts to nothing more than what is ordinarily expected and is the mere expression of natural affection and cordiality that normally exists between a parent and child and this court has repeatedly held, as have all other courts, that this alone does not constitute or establish what is referred to in the books as fiduciary or confidential relations.

To substantiate this statement, let us look at the record. Luther Stoneman was twice married. To the first marriage was born the defendant, Arthur Stoneman. His mother died about 1873 at which time Arthur was about one or two years of age. Luther Stoneman employed a young lady to come into the home and keep house and care for the young son, Arthur. The household then consisted of the father, his young son, the housekeeper, and the hired man. They lived on a farm near Winthrop, Iowa. After a few years, the father married the housekeeper and she is known in this record as Aunt Belle or Isabel Stoneman. They continued to live in this way on the farm until Arthur was married about the year 1893 and brought his bride to this home. Soon after this, Luther and his wife moved to the town of Winthrop and the son and his wife continued to live on the father's farm for a number of years. Isabel cared for young Arthur, treating him as a mother would her own son. Luther died in 1906. He had no other children.

In the settlement of the estate, Isabel Stoneman, according to the record, thought she was imposed upon by Arthur and others and hard feelings were engendered and this feeling of unfriendliness continued unabated until about 1929 or 1930, a period of more than 20 years, during which time there was no visiting back and forth between the family of Arthur Stoneman and his stepmother, Isabel. Once, when Arthur was sick, Isabel stopped to see how he was and, in 1927, a son of Mr. and Mrs. Stoneman died in Colorado, where his parents had gone to live in the hope of finding a more healthful climate,

and, at that time, Arthur's daughter, Mrs. Fordice, called on Isabel to see if they might bury the son on the Isabel Stoneman family lot. This permission was granted. This seemed to be the means of breaking the ice and ultimately restoring amicable relations among the members of the family. Arthur and his wife moved back from Colorado, after the son's death, about the year of 1929 or 1930 after which time friendly relations were gradually restored between him and his stepmother and, at the time of the execution of the deed involved, they were on intimate, friendly terms.

Isabel Stoneman's holdings consisted of this home property, which was later sold for $3,000; a $2,000 mortgage, which is the one assigned to Arthur; $40 a month Soldier's Widow's pension and a 4-acre pasture tract in which she had an interest, perhaps a life estate, entitling her to the rentals. For a number of years after her husband's death, she conducted a rooming and boarding house and was a strong, active, robust woman looking after her own business in a competent and capable manner. After she quit keeping boarders, she had no business other than looking after her garden, paying her taxes, collecting her pension, buying groceries and fuel, and collecting the interest on her mortgage. She did improve her home, installing a furnace, electric lights and water, all of which she looked after herself up until the last few years, when, because of her natural failing vigor coupled with some kind of bowel ailment causing her to experience difficulty in controlling the calls of nature, she seldom left the premises and was compelled to call on her neighbors to assist her in getting her mail from the post office, taking her pension check and getting it cashed, finding out about her taxes and bills and paying the same.

This was mostly done by a Mr. Hocken, a close neighbor and old friend. He would bring her the pension check from the post office; she would indorse it, and he would bring her back the money. He would go to the treasurer and get a statement of her taxes and she would give him the money with which to pay the same. Occasionally, some of the other neighbors would attend to these chores for her and once or twice, according to the evidence, she seemed to be confused as to the amount of her coal bill and grocery bill. She had very little surplus cash on hand at any time and what she had she kept in her pocketbook in the bureau drawer. She always knew

what property she had. She kept track·of when the interest
was due on her mortgage. In connection with all these matters,
there is no evidence of abnormal conduct worthy of mention.
Most of plaintiff's witnesses mentioned the fact that she was a
religiously inclined woman, loved her church and was a con-
stant attendant, but ceased to go the last year or so although
the church was only a block away from her home. The excuse
she gave to most of them, as they testified, was that she was
unable to walk; however, she had confided to two of her close
neighbors, who were witnesses in the case, that she couldn't
trust herself away from home because of the bowel complaint.
She did get about the house and yard, most of the time using
a cane, and called on the near neighbors occasionally. She
never was out of money but once when, because of hard times,
her mortgagor was unable to pay his interest promptly and
she borrowed $20 from Mr. Hocken which she paid back. When-
ever she paid out money she demanded a receipt and when
others paid her she always gave them receipts. This seemed
to be a business rule of hers which she insisted on being
observed. During all this time, during which she was obliged
to call on her neighbors for assistance in connection with these
small chores, there isn't a word of evidence in the record that
she ever asked her stepson, Arthur, to assist her or that he
ever did assist her in a single instance. His activity, up to
the time the deed was made, in so far as she was concerned,
was confined to the single task of voluntarily aiding to some
extent in getting attendants to stay with her. The evidence
substantiates the fact that it was the difficulty and inability,
finally, to secure others to live in the home with her and look
after her which was the ostensible object and purpose in Arthur's
coming to town and moving in with her so he and his wife
might look after her themselves. There isn't a word of evidence
that Isabel Stoneman ever asked her stepson to assist her in
this respect or that she ever looked to him for assistance in
any of these little matters in connection with the daily routine
of her life. His actions in that regard are all properly refer-
able to his natural filial duties. True, some of the witnesses,
in answer to leading questions, testified that she appeared to
have confidence in Arthur and appeared to lean on him, but
this can be given little, if any, weight in the absence of evi-
dence of any fact bearing out such assertions.

Briefly, the circumstances surrounding the execution of the deed are these. Arthur called on Mr. Merrill, a notary public, a neighbor and friend of Mrs. Stoneman and told him they had some papers to acknowledge and that he and his wife were going to take care of Aunt Belle and she was going to transfer the property to them. Two neighbor ladies were present when the deed was signed. When Merrill reached the home, the deed, including the jurat, which had already been prepared —by whom and at whose request is not shown—was produced and carefully read over to Mrs. Stoneman; Merrill asked her if she wanted to sign it and she said she did and asked "just where do I sign?" She signed the deed without assistance; the notary signed and affixed his seal and it was left there. Just who took charge of it is not shown. It appears, from the evidence, that Aunt Belle knew fully about the transaction. She told some of the neighbors, before, that Arthur and his wife were coming to live with her and, afterwards, told them the property was Arthur's and he could do as he pleased with it. The deed was placed on record shortly after its execution and the neighbors, friends and relatives of Mrs. Stoneman had both actual and constructive notice of what had taken place. The evidence does not reveal that any one questioned her ability to enter into this transaction with her stepson or that there was anything wrong about it; in fact, the inference is that every one was pleased until later on, when the property was sold, making it necessary to move Aunt Belle out of the old home. Then, and not till then, was there complaint made. There is evidence by two nieces that Aunt Belle was not, at the time, pleased with this but said there was nothing she could do about it; she later expressed herself as being very much pleased with the new home. At no time did she ever, by word or act, indicate she was not perfectly satisfied with the arrangements brought about by deeding the property and Arthur's moving in and caring for her.

In the sense that Isabel was unable to walk downtown and personally attend to the small business affairs and do all of her housework, she was, of course, dependent on someone, but in no other respect can it be said she was dependent, and, in this respect, it cannot be said that she was dependent upon her stepson, Arthur. As heretofore stated, Mr. Hocken looked after most of her business affairs and some of the neighbors

and relatives assisted her with the household. She paid for all these services. When she paid her bills, she insisted on a receipt and gave receipts to those who paid her money; she never had any difficulty in writing. She subscribed for and read the local paper. Aside from her physical infirmities, there isn't any evidence that she was ever dependent on any one else to transact her own business affairs. There is an abundance of evidence to the effect that, while Aunt Belle was a lovely old lady and had a host of friends, many of whom were devoted to her as is revealed by the fact that they made it a habit to call on her regularly, yet, at the same time, she was self-willed and domineering and not a person who could be easily influenced. Her nephew, Elmer Glass, who owed her the $2,000 note and who has the greatest interest in the success of plaintiff's cause, testified concerning a transaction in which he and his lawyer, Mr. Kremer, a member of the law firm representing plaintiff, undertook to persuade Aunt Belle to renew the note. They carried on the transaction with her personally and she handled her end of the matter unassisted. She simply declined to renew the note. Glass said she was, at that time, looking after her own business. Glass and the lawyer did not succeed in their purpose. When Glass paid his interest at this time, he demanded of her a receipt and she gave it to him. This was after she was living with Arthur, but there is no evidence that he was even present or that she sought his advice. Glass testified, as a witness for plaintiff, in substance, that she was a woman who was apt to take care of her own business; always had that disposition and didn't like to be told what to do; nobody was apt to domineer over her. Glass testified, further:

"Q. That was her disposition, not to be controlled by anybody, isn't that right? A. Yes, sir.
"Q. Isn't that right? A. Yes, sir."

Other witnesses testified along the same line and no one disputes this fact. There was, of course, in this, as in all cases of this kind, testimony of failing memory, childishness, and eccentricities and, based on such incidents, witnesses testified her mind was unsound. None of it is convincing. No medical experts were called.

While the record does not disclose that she ever had inde-

pendent advice from anyone concerning the execution of this deed, she did have access to these numerous friends—to Mr. Allen, whom she named as one of the executors of her will, to Mr. Hocken and to any of these lady acquaintances and nieces. She had a telephone; she had a mind of her own and, had she felt she was being imposed upon or in any way coerced, she could have easily called for assistance. It was known in the neighborhood before Arthur moved in that he was moving in to take care of her. Aunt Belle spoke of it to the neighbors and seemed pleased. Several years before she had offered to deed the property to Mr. Allen if he and his wife would move in and take care of her. The deed expresses the consideration of $1 and other valuable consideration and was made "subject to the life use of grantor". It was filed for record a few days after it was executed and was constructive notice to everyone and the evidence shows that the neighbors, friends, and relatives of Mrs. Stoneman had actual knowledge of the execution of the deed. Aunt Belle told several of the neighbors what she had done; and that the property was Arthur's and he could do as he pleased with it. The only improvident element in the transaction arises from the fact that there was no written contract binding the grantee to carry out the purpose orally expressed by Arthur and which was the consideration for the deed, namely, caring for his stepmother in exchange for the property. That he did, in fact, give her the best of care until the day of her death and bound himself to pay her funeral expenses, is undisputed in the record and that she was happy and contented. At the time she executed this deed, she still had all her income remaining and had her home, as the deed reserved to her a life use of this property. There is nothing unnatural or unusual in the transaction. While Arthur was her stepson, she had raised him from a baby. She had no children of her own. She at no time expressed dissatisfaction or in any way indicated the slightest regret for what she had done.

Viewed from the standpoint of an impartial observer, the record contains little support for appellee's contention that appellants had a preconceived, sinister design and scheme to cheat and defraud Mrs. Isabel Stoneman by obtaining a conveyance of her property. It must be kept in mind that Arthur was the natural object of her bounty.

We do not believe there is a case among the many authori-

ties in this state where this matter has been before us in which the facts are in any way parallel to the facts in the instant case in which we held confidential relationship existed. Many cases are cited and relied upon by appellee, but, in every one, the facts are easily distinguishable. The cases of Curtis v. Armagast, supra; Johnson v. Johnson, 196 Iowa 343, 191 N. W. 353; Hull v. Mitchell, 181 Iowa 51, 162 N. W. 235; Ennor v. Hinsch, 219 Iowa 1076, 260 N. W. 26; McNeer v. Beck, 205 Iowa 196, 217 N. W. 825; Vorse v. Vorse, 186 Iowa 1091, 171 N. W. 186; and Pruitt v. Guase, 193 Iowa 1354, 188 N. W. 798, in all of which the legal principles involved are fully considered and applied, are cases where the fact situations are not similar to the facts in the instant case.

We see nothing in this entire record, in so far as this deed is concerned, which would warrant us finding either actual or constructive fraud without which a court of equity is not warranted in setting aside an executed contract such as a warranty deed. In Lawson v. Boo, 227 Iowa 100, 105, 287 N. W. 282, we said:

" * * * want of consideration of itself would not warrant setting aside the deed. 'It was competent for the grantor to make a gift of his property. Want of consideration would be a good defense to an executory contract. But a deed is not such. It represents a contract executed, and a conveyance fully accomplished.' Stauffer v. Milner, 207 Iowa 776, loc. cit. 784, 223 N. W. 686; Stonewall v. Danielson, 204 Iowa 1367, 217 N. W. 456.''

There is some confusion in the record as to whether Arthur had moved in with his stepmother at the time the deed was executed, but we are satisfied, from the evidence, that he moved in after the deed was executed.

Count II of the plaintiff's petition is, in our judgment, supported by sufficient evidence. We will not go into a detailed analysis of the evidence further than to say it is shown that, after Arthur and his wife moved into the home, he then did take charge of the household and Aunt Belle then became a member of his household. He managed what little business affairs she had and looked after supplying all her household needs; the pension money contributed to the support of the family. In March, 1937, about a year after Arthur obtained

a deed to the home property, he sold it for $3,000, a very favorable price, and purchased another house in Independence, taking title in his own name. While this was known to Aunt Belle, and she said to some of the neighbors that "it is Arthur's property, he can do as he likes with it," there is evidence that she loved her old home and left it more or less under protest, but was persuaded to move by Arthur and his wife. She afterwards, however, expressed herself as being satisfied and happy in the new home in which she had the convenience of a bathroom adjacent to her bedroom which was very essential because of her ailment. In this situation, we are quite satisfied that Arthur had a dominant position and it was after this, i. e., on May 17, 1937, that the assignment of the mortgage was procured.

It came about in this way: Arthur said to his stepmother, in substance, You have been telling everyone that you have turned over all your property to me and you haven't yet turned over the mortgage. She replied, "Yes, but I will." Arthur then had an attorney of his own selection prepare the assignment and call at the home. After visiting awhile with Aunt Belle about the time when they used to be together, when she was more active, the lawyer said to her, "I have the paper for you to sign." She said, "What's this paper you have for me to sign?" The lawyer said, "This is a mortgage you hold on the Elmer Glass farm and you are assigning it over to your stepson, Arthur Stoneman." She got up and went alone to the bookcase and signed it.

This $2,000 indebtedness was amply secured, it seems, and was an interest-bearing security. This assignment deprived her of a substantial part of her income producing property. Arthur also collected the small rental from the 4-acre pasture tract. He was possessed of all her income, rendering his stepmother entirely dependent on him for support. More could be said, but this is sufficient to show, as we think, a marked contrast between the situation of the parties at the time the deed was executed and the time this assignment was made.

The decree of the trial court is reversed as to Count I, the deed transaction, and affirmed as to Count II, the assignment transaction, and the case remanded with instructions to enter a decree in harmony with this opinion. Costs to be

taxed to appellee.—Reversed in part, affirmed in part and remanded with instructions.

OLIVER, C. J., and SAGER, BLISS, STIGER, and MILLER, JJ., concur.