DORIS N. GROVES, appellant, v. RALPH W. GROVES et ux., appellees.

No. 49139.

(Reported in 82 N.W.2d 124)

APRIL 3, 1957.

Doran, Doran, Doran, Erbe & Doran, of Boone, for appellant.

Phelan, Karr & Karr, of Webster City, for appellees.

GARFIELD, J.—On May 18, 1954, plaintiff, Doris N. Groves, a widow then 86, made an absolute warranty deed to her son Ralph, then 64, of 220 acres of unimproved farm land in Hamilton County. The deed recites consideration of one dollar and other valuable considerations. Value of the land was $77,000. On the previous March 1st plaintiff made a written lease of the same land to Ralph for ten years at annual rent of $2000 plus taxes and expense of keeping up the fences. Ralph farmed the land as tenant since March 1, 1941, on these terms except he did not pay the taxes until 1943. However, the lease for the ten years 1941 to 1951 called for crop-share rent.

On January 21, 1955, plaintiff brought this equity suit to set aside the lease and deed on the grounds she was not mentally capable of appreciating their significance, Ralph took advantage of the confidence plaintiff reposed in him, the instruments were not delivered and lacked consideration. Trial was had in February 1956. Plaintiff testified only by deposition taken in May 1955. The trial court dismissed the petition but defendants Ralph and wife offered, and were required to, convey to plaintiff a life estate in the land. This defendants did subject to the lease made March 1, 1954. Plaintiff has appealed.

Since the decision depends to a considerable extent on the facts a statement of the important ones is called for.

Plaintiff is the widow of Alexander Groves who died intestate November 8, 1934, also survived by three sons and a daughter. They are, in order of birth, Carl, Ethel, defendant Ralph, and Wilfred. All were in their sixties at the time of trial. Carl lives in or near Eagle Grove. If he is interested in the case the record does not show it. Ethel is a widow living in Portland, Oregon. Ralph is a farmer near Webster City and Wilfred and plaintiff live in separate homes in that city.

Until recently plaintiff has long been prominent in social and public affairs in the community. Since 1949 she has been virtually blind in one eye and does not see well with the other.

She reads only with the aid of a large magnifying glass. She suffered some form of heart attack at Christmas 1953 and has not enjoyed good health since then. She was in the local hospital from April 22 to 29, 1954.

The land in question is part of 1040 acres of farm land owned by the father at his death. Three hundred and twenty acres were in Wright County, the rest in Hamilton. Before his death the father had given each of his sons a farm. One of 240 acres in Wright County was placed in Carl's name, 200 acres in Hamilton County were given Ralph, and 240 acres (also in Hamilton) were given Wilfred. However, Wilfred agreed to pay his father $4000 for 40 of his 240 acres. These three farms are in addition to the 1040 acres the father owned at death.

The improvements on Ralph's 200 acres were of little consequence and he mortgaged the land for $20,000 with which to build new ones. Ralph also owed a bank about $18,600 in his father's lifetime. In order to pay the bank the father had Wilfred mortgage his farm for this last amount and take a second mortgage on Ralph's land as security for it. The father also agreed to indemnify Wilfred against loss from the loan of $18,-600 to Ralph.

Based on this indemnity agreement Wilfred filed a claim against his father's estate, alleging the second mortgage on Ralph's farm was worthless. The claim was allowed for $16,605 against which was set off $3620.25, the amount unpaid on Wilfred's debt to his father for 40 acres of Wilfred's land. At the same time (July 6, 1935) Ralph's total debt to his father's estate was fixed at $20,774.25 and plaintiff, as administratrix, was authorized to retain Ralph's share in the estate to reimburse it for the debt.

Thereafter the 1040 acres were divided among plaintiff, Carl and Wilfred. Ralph received none of this land, his share having gone to satisfy his indebtedness to the estate as just explained. The 320 acres in Wright County, where Carl lives, were quitclaimed to him, subject to a mortgage of $26,000. Ethel quitclaimed to Wilfred her interest in the estate and received in return a deed to the 240 acres Wilfred acquired from the father in his lifetime, subject to a debt of $2000. The 720 acres

in Hamilton County left by the father went to plaintiff and Wilfred, the plaintiff's share being .38 and Wilfred's .62. Plaintiff also received the home in Webster City.

Apparently about the time the administratrix' final report was filed on October 8, 1937, plaintiff and Wilfred divided the 720 acres by plaintiff's taking 280 and Wilfred the remaining 440 acres. Then plaintiff sold 60 of her 280 acres to Wilfred for $90 an acre leaving her with the 220 acres now in controversy. The deeds between plaintiff and Wilfred are dated October 12 and filed December 16, 1937. The land Wilfred acquired is known as the old home place and had a nice set of improvements on it.

Recital of the above details seems necessary in view of Ralph's contention he received less than his fair share of his father's estate and would have contested the settlement except for his mother's promise that if he would refrain from doing so she would give him the land in controversy when she was through with it.

Plaintiff first leased her 220 acres to Ralph in August 1940 for ten years commencing March 1, 1941. As previously stated the lease called for share rent. Ralph says he told plaintiff sometime in 1941 he would rather pay her cash than share rent, as he was buying corn and oats to feed, and plaintiff said that would be all right. Ralph paid his mother $2000 rent annually until the time of trial and in addition $100 in 1946, $500 in 1948, $100 in 1949, $250 in 1954, and $1000 in 1955 (after this suit was started). As before indicated, Ralph also paid taxes on the land commencing in 1943, also plaintiff's personal tax and automobile license fee. And, as stated, Ralph kept up the fences.

A second lease was made for five years commencing March 1, 1951, at $2000 yearly rental plus taxes and expense of keeping up fences. On March 1, 1954, when this lease had two more years to run, the lease now sought to be set aside was made. Ralph's explanation for the fact this last lease was made so soon is that he planned to build new woven-wire fences, mistakenly thought the second lease had only one more year to run and he felt he should have a lease for the longer period.

The three leases were prepared by Ralph's attorney. A real-estate dealer testifies for plaintiff the reasonable rental value

of the land from 1941 to 1951 was $25 an acre. Ralph says he offered his mother more rent at different times but she did not want it.

Except when Ralph was away on a trip he called on his mother nearly every day. He brought her milk at least every other day. Ralph's wife, known as Betty, was also a frequent visitor. Wilfred called on plaintiff perhaps as often as Ralph did. Wilfred's wife, Helen, was also a frequent caller.

On May 12, 1954, plaintiff handed Ralph an envelope containing a carbon copy of her will made November 3, 1949. Ralph testifies he asked her to identify the envelope and she wrote on it: "This is a copy of which the original lies in my box in the Hamilton Co. Bank. Another copy is in the possession of Henderson and Jones.

Doris N. Groves.

"May 12, 1954."

Henderson & Jones was the name of a law firm composed of former District Judge Henderson and his partner. They witnessed the will and presumably prepared it. There is no evidence Ralph had anything to do with its preparation. This will left the 220 acres in question to Ralph and nominated him executor without bond. Just before naming the executor the will recited: " 'The foregoing disposal of my estate is made in view of gifts and settlements heretofore made with my children in connection with the estate of my deceased husband, Alexander Groves.' "

Attached to the copy of the will was a carbon copy of a codicil dated July 28, 1953, also witnessed by Judge Henderson and his partner, which provided the federal estate tax should be paid by Ralph, Wilfred and Ethel and also: " 'I hereby approve and confirm said will in its entirety.' "

About the time this suit was commenced plaintiff made a new will, prepared by Judge Henderson (who died before the trial). Plaintiff first declined to say to whom this new will leaves the 220 acres but testifies later she does not remember. She finally says it does not leave the land entirely to Ralph.

Ralph testifies plaintiff told him, when she handed him the envelope, she left him the farm in her will and he told her "Wills have a habit of disappearing. If you want me to be

sure to have the farm it would be best to give me a deed for it." And according to Ralph plaintiff replied " 'That is right. I will do so.' " Plaintiff says she remembers something like the former remark by Ralph but does not remember her reply.

Ralph testifies that a short time after plaintiff gave him the envelope she asked him to return it as she would like to read it over, he did so, she read the copy of the will and asked him to read it, she said " 'That is the way I want it. You keep it but say nothing about it to anyone.' " Ralph also says his mother asked about his attorney, Mr. Guthrie, preparing a deed to the land and he arranged with Guthrie to do so. Ralph had conferred with Mr. Guthrie about such a deed on May 12 and Guthrie evidently prepared it May 15. Ralph also conferred with his attorney on May 18, the day the deed was signed. Plaintiff's diary shows Ralph called at her home three times on May 16, three times on the 17th and once on the 18th. Ralph's wife, Betty, and Wilfred also called on the 17th.

On May 18 Mr. Guthrie sent his secretary, Mrs. Ryan, to plaintiff's home with the deed. Mrs. Ryan testifies she has long known plaintiff and told her she had the deed, plaintiff said Ralph had told her the witness would be coming there, she read the deed to plaintiff and handed it to her and she read it, the witness explained it was a deed to the farm Ralph had been renting from her, plaintiff said she knew it and asked if the witness was sure the description was right, plaintiff then signed the deed, the witness signed the acknowledgment, took the deed and delivered it to Guthrie. Ralph says, however, plaintiff gave him the signed deed later that day and Mr. Guthrie testifies he obtained it from Ralph.

Plaintiff says Mrs. Ryan telephoned her on May 18 she was coming to the home but denies Mrs. Ryan read the deed to her or told her what it was and denies she herself read it. Plaintiff also testifies she supposes she knew she was signing a deed to her farm but she did not appreciate it was everything she had. Plaintiff signed the deed "Doris M. Groves." Apparently she never used the initial "M" before. Her true name is Doris N.— the N. is for Neel, her maiden name.

Ralph says that about a month after plaintiff signed the deed she told him "Helen (Wilfred's wife) says the boys need

this land in their farming operation and I wish you would leave it to them when you are through with it." The reference was to Wilfred's sons who evidently farm his land which adjoins the 220 acres. Ralph also testifies that for about the next four or five months plaintiff frequently asked if he had arranged to leave the land to Wilfred's boys. Plaintiff admits she suggested to Ralph once it would be nice for him to leave the land to his nephews when he was through with it.

Ralph was unwilling to agree to leave the 220 acres to Wilfred's sons. In December (1954) plaintiff asked Ralph to return the deed (land) to her but he declined to do so. Plaintiff then told him he would not be welcome in her home and Ralph said, "Well, good bye Mother. You are a nice girl and I still love you." Ralph then discontinued his frequent calls upon his mother. This suit was started soon afterwards.

Mr. Guthrie, Ralph's attorney, testifies he saw plaintiff in December and she agreed it was the original arrangement Ralph was to have the farm ultimately but she now wanted it otherwise and wanted the deed returned to her. Betty says plaintiff told her the day after this suit was started that plaintiff intended for Ralph to have the land and she left it to him in her will. Ralph testifies plaintiff told him at the time the last lease was signed (March 1, 1954) the farm would be his.

Ralph and Betty both say that in 1946 plaintiff handed Ralph an abstract of title to the 220 acres (and other land) and said to him, " 'This is the abstract to my farm. Take it because it will be yours some day.' " The following day Ralph had his attorney prepare an affidavit reciting this occurrence, Ralph signed and swore to it and attached it to the abstract. Plaintiff says she does not remember giving Ralph the abstract or saying the farm would be his.

Ralph also testifies that in 1936 plaintiff gave him a typewritten statement signed by her, which he produced. It is dated at Webster City, April 6, 1936, is addressed "To Whom It May Concern" and says any property or money she has turned over, or may in the future turn over, to Ralph shall be considered an outright gift, not an advancement, and her executor is not to consider it part of her estate or attempt to recover it unless

it is in the form of a note or other writing signed by Ralph. He further says he did not have the paper prepared and does not know who did.

We have referred to Ralph's contention plaintiff promised to give him her land when she was through with it if he would not contest the settlement of his father's estate. Plaintiff denies she made such a promise and Wilfred and Ethel testify, in effect, they know nothing of one having been made. Plaintiff does say, however, she remembers Ralph was not satisfied with the estate settlement, told her in effect he was going to contest it and that she told him if he would agree to it she would help him—make it right with him. Plaintiff did give Ralph $1500 sometime after his father died. Ralph testifies he did not ask for it. Plaintiff also helped finance the college education of Ralph's daughter.

On the question whether a confidential relation existed between plaintiff and Ralph, no doubt Ralph was close to his mother in a filial way. Throughout his tenancy Ralph, at plaintiff's request, deposited most of his own rent checks to plaintiff's account in the bank. The banker says it is an occasional business practice for tenants to do that. Plaintiff endorsed some of these rent checks, many were not endorsed and at least three were endorsed in plaintiff's name "by R. W. Groves" (Ralph). At plaintiff's request Ralph also made some other deposits for her. Plaintiff testifies, "I wrote my own checks. Ralph never wrote any that I can remember. I took care of my own bank account. Ralph did not take care of it." We have mentioned the fact Ralph paid the taxes on the land and plaintiff's personal taxes with his money.

Plaintiff says Ralph has taken care of all her business affairs she had not cared for herself and he was her chief adviser but she could give no example of advice from Ralph that she followed. Ethel and Wilfred both testify Ralph was plaintiff's business adviser but seemed unable to give any instance where his advice was given. In three matters of some importance Ralph did give plaintiff advice but she did not follow it. Ralph told her her old home (Neel) farm would be a good buy for her at $100 an acre. He also advised against her renting, and later selling, her Webster City home.

We have said plaintiff has not enjoyed good health since Christmas 1953. When the lease and especially the deed in controversy were given plaintiff was confined to her home, in bed much of the time, in a weakened condition. She was at all times rational and recognized her many callers. However, her doctor testifies that after April 21 (1954) she was not her usual acute self, she could be easily influenced by anyone close to her and was not competent to do business that involved sustained judgment in making a decision. A neighbor who is a registered nurse and assisted plaintiff some in May gives similar testimony although she adds she did not mean to say plaintiff was mentally incompetent. There is other evidence, for defendants, that indicates plaintiff was mentally competent when the instruments in question were made.

Although we will make further reference to the facts, the above is a sufficient indication of them now.

I. The vital question in the case is whether, at the time the deed was made, a confidential relationship existed between plaintiff and Ralph in which he was the dominant person and she the subservient one. The trial court held this was not shown. Although our review is de novo we give weight to the trial court's findings. Stephenson v. Stephenson, 247 Iowa 785, 799, 74 N.W.2d 679, 687; Knigge v. Dencker, 246 Iowa 1387, 1395, 72 N.W.2d 494, 498. See also Luebke v. Freimuth, 248 Iowa 58, 67, 78 N.W.2d 473, 479. While the case may be close, when we give these findings the weight to which they are entitled we are not justified in reaching a contrary conclusion.

Plaintiff had the burden to show by clear proof such relationship existed. Olsson v. Pierson, 237 Iowa 1342, 1346, 25 N.W.2d 357, 359; Else v. Fremont Methodist Church, 247 Iowa 127, 139, 73 N.W.2d 50, 57; Stephenson v. Stephenson, supra, 247 Iowa 785, 793, 74 N.W.2d 679, 684.

The question of confidential relationship assumes such importance because actions of this kind in which the relationship exists are governed by a different rule than applies where it is absent. Ordinarily one who attacks a deed because of fraud or undue influence must show existence thereof by clear, satisfactory and convincing proof. However where it clearly appears

the grantee was the dominant person in a confidential relationship with the grantor there arises a presumption the conveyance was obtained by fraud or undue influence which the grantee must rebut by clear, satisfactory and convincing evidence.

We have been slow to define the precise limits of a confidential relationship. It is clear it may exist although there is no fiduciary relation. As Restatement, Trusts, section 2, comment b, says, it exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind. It does not arise solely from blood relationship such as between parent and child. The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. Purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence.

Numerous decisions support the above views. The leading ones are Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873, and Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397. See also Albaugh v. Shrope, 197 Iowa 844, 849, 850, 196 N.W. 743; Utterback v. Hollingsworth, 208 Iowa 300, 302, 225 N.W. 419, 421; Arndt v. Lapel, 214 Iowa 594, 600–603, 243 N.W. 605; O'Brien v. Stoneman, 227 Iowa 389, 390–393, 288 N.W. 447; Stephenson v. Stephenson, supra, 247 Iowa 785, 793, 794, 74 N.W.2d 679, 684, 685.

That a person by kind and considerate treatment induces an affectionate regard on the part of another raises no presumption of confidential relation, as the term is used in this connection, in the absence of some showing that by this means, a dominant influence was obtained over the other. Albaugh v. Shrope, supra; Hess v. Pittman, 214 Iowa 269, 276, 242 N.W. 113.

As we have indicated, there was undoubtedly a close family relationship between plaintiff and Ralph—closer than between many mothers and adult sons. Ralph was almost a daily visitor in plaintiff's home and did many errands for her. However, Wilfred, who is at odds with Ralph in this controversy, also called on plaintiff very often and did some errands for her. There is little if any evidence Ralph ever transacted any business for plaintiff except, at her request, to deposit in her bank

account the rent he owed her and to make a few other deposits for her. Of course his arrangement with plaintiff required him to pay his rent and taxes on the farm and in doing so he was acting for himself as much as for plaintiff. He paid plaintiff's personal taxes and automobile license fee with his own money as an accommodation to her.

■ Testimony of plaintiff, Ethel and Wilfred, over defendants' objection it was a conclusion, that Ralph was plaintiff's adviser is of little weight in the absence of evidence of facts bearing out these assertions. O'Brien v. Stoneman, supra, 227 Iowa 389, 395, 288 N.W. 447; Else v. Fremont Methodist Church, supra, 247 Iowa 127, 140, 73 N.W.2d 50, 57 ("* * * the facts showing the manner in which trusts and confidences had been reposed in the dominant party, must appear"). It is significant that in the only matters it is definitely shown Ralph advised plaintiff, before the deed was given, she did not follow his advice.

■ In the absence of a clear showing there was a confidential relationship between plaintiff and Ralph in which he was the dominant person, giving rise to a presumption the deed was obtained by fraud or undue influence, there is insufficient evidence of actual fraud or undue influence to warrant setting it aside on such ground.

■ II. On the claim of mental incapacity plaintiff had the burden to show by clear, satisfactory and convincing evidence that at the time she made the deed she was incapable of understanding in any reasonable manner the nature of the transaction and its consequences and effects upon her rights and interests. Stephenson v. Stephenson, supra, 247 Iowa 785, 788, 74 N.W.2d 679, 681, and citations; Else v. Fremont Methodist Church, supra, 247 Iowa 127, 147–151, 73 N.W.2d 50, 61–63, and citations. See also Knigge v. Dencker, supra, 246 Iowa 1387, 1394, 72 N.W.2d 494, 497.

Although plaintiff was in a weakened physical condition which doubtless impaired her mental capacity to some extent, we are agreed the showing of mental incapacity is insufficient to justify setting aside the deed on this ground. Such showing here appears to be less strong than in some cases in which relief on a similar claim was denied. Stephenson and Else cases, supra (last above); Foster v. Foster, 223 Iowa 455, 273 N.W. 165;

Utterback v. Hollingsworth, 208 Iowa 300, 309, 310, 225 N.W. 419, and Albaugh v. Shrope, 197 Iowa 844, 853, 857, 196 N.W. 743, both supra.

 III. There is quite a little reliable evidence, much of it undisputed, that for many years before this deed was made plaintiff intended Ralph to have this land when she was through with it. We regard this as highly important. It is reasonable to conclude, as the trial court did, the deed was made in order to carry out this intent rather than through any abuse of confidence on Ralph's part or mental incapacity of plaintiff. See in this connection Knigge v. Dencker, 246 Iowa 1387, 1394, 1395, 72 N.W.2d 494, 497, 498, and Stephenson v. Stephenson, 247 Iowa 785, 74 N.W.2d 679, both supra.

Plaintiff's 1949 will prepared by her own attorney with which, so far as shown, Ralph had nothing to do is clear evidence plaintiff then intended the land to go to Ralph. She confirmed this intent in July 1953 by her codicil, also presumably prepared by her attorney. Her will was made very soon after she returned from a visit of several months with her daughter in Portland. Other testimony indicates plaintiff had the same intent with reference to the disposition of her land both considerably before and after the will and codicil were made.

Further, the recital in the 1949 will heretofore quoted lends support to Ralph's claim it was understood he was to have this land ultimately if he would not contest the settlement of his father's estate. Plaintiff herself testifies, as previously stated, Ralph was not satisfied with the settlement and told her in effect he proposed to contest it and that she told him if he would agree to it she would make it right with him. It is true plaintiff later gave Ralph $1500, helped finance his daughter's education and rendered him some further assistance.

Whether the settlement of the father's estate was fair to Ralph is a collateral issue it is unnecessary to decide. There is, however, some basis for defendants' contention on this point. It is true that when the father died during the depression in 1934 farm land was selling very low and good farms could be purchased for about $100 an acre. The land in the father's estate

was appraised at and somewhat below this figure. From this plaintiff argues the cancellation of Ralph's indebtedness to the estate, which exceeded $20,000, was the equivalent of his receiving 200 acres ·of land. But, at least in the light of subsequent developments, this does not tell the whole story.

Even before the estate was settled in the fall of 1937 farm land began to advance in price until, when the deed was made, it had increased in value three and one-half times. The land Ralph received from his father in the latter's lifetime was without buildings of substantial value and Ralph's indebtedness to the estate did not greatly exceed the amount he borrowed for the purpose of building new ones. Ralph's sister and two brothers each received an improved farm either in the father's lifetime or afterwards. The father had paid $70,000 in cash for the farm which went to Carl, and Wilfred received the nicely improved home farm, in the final settlement. Under these circumstances it is not surprising plaintiff intended, for a considerable time, to leave the 220 acres to Ralph.

After plaintiff made the deed she changed her mind as to the disposition she wanted to make of this land. Apparently she then desired that it go ultimately to Wilfred's sons, and Ralph's refusal to agree to this precipitated the lawsuit. Just what caused this change of mind does not clearly appear. There is some evidence it followed a suggestion from Wilfred's wife. In any event the belated change in plaintiff's intent from that so long held by her does not entitle her to relief.

It is true the deed did not reserve a life estate in plaintiff. It should have contained this reservation. However, from the time defendants filed answer to plaintiff's original petition they conceded plaintiff was entitled to such reservation and the decree provides therefor.

IV. There is no merit to plaintiff's contention the deed was not delivered. The trial court found the notary, Mrs. Ryan, as she testified, took the executed deed to Mr. Guthrie, Ralph's attorney. As previously stated, Ralph says plaintiff gave him the deed and he later gave it to Guthrie. If Mrs. Ryan's testimony on this point is accepted there was a valid delivery. Neither Mrs. Ryan nor Mr. Guthrie was plaintiff's agent and delivery to either was at least impliedly for the

grantee. See Calbreath v. Borchert, 248 Iowa 491, 494, 81 N.W.2d 433, 436, and citations.

 V. If we assume the deed was a gift, without consideration, it is not for that reason invalid. Plaintiff had a right to make such a gift. Want of consideration is a ground for avoidance of an executory contract but not, as between the parties thereto, of an executed conveyance. O'Brien v. Stoneman, supra, 227 Iowa 389, 399, 288 N.W. 447, 452, and citations; Vorse v. Vorse, 186 Iowa 1091, 1099, 171 N.W. 186; 16 Am. Jur., Deeds, section 57; 26 C. J. S., Deeds, section 16.

VI. There is less basis for plaintiff's attack on the lease dated March 1, 1954, than for her attempt to set aside the deed. The lease merely continues an arrangement that had been in effect since about 1943. It is true the term is ten years and the stipulated rent is low. The testimony is undisputed that Ralph at different times offered plaintiff more rent and did pay her some amounts in addition to the agreed rent. It is to be hoped Ralph will continue to do this notwithstanding this litigation.

VII. About three months after filing of the trial court's decision plaintiff filed a petition for new trial based on newly discovered evidence of Mr. J. W. Lee who was attorney for plaintiff as administratrix of her husband's estate. Mr. Lee's affidavit, attached to the petition, states that during settlement of the estate the agreed value of the land was increased to $125 an acre in order that Ralph's share would be sufficient to satisfy his indebtedness to the estate; there was not, to affiant's knowledge, any threat by Ralph or his then attorney to contest the settlement nor any promise by plaintiff to will or deed the property she acquired from the estate to Ralph if he would not do so; about 1941 or 1942 there was sent to affiant's office from the office of Ralph's then attorney a deed to the 220 acres in question from plaintiff to Ralph, reserving a life estate to plaintiff, with the request that affiant obtain plaintiff's signature thereto, which affiant refused to do and stated he would advise plaintiff not to sign. Also that prior to trial of the case plaintiff's attorney discussed with affiant what he knew concerning the estate but affiant's wife was then seriously ill and he could remember little, but since the trial he had refreshed his recollection.

Defendants' resistance to the petition denies it alleges newly discovered evidence which could not with reasonable diligence have been discovered and produced at the trial, asserts the proposed evidence of Mr. Lee is merely cumulative and would not with reasonable probability bring about a different result. The petition, submitted without argument, was overruled.

The petition was evidently filed under rule 252(f), Rules of Civil Procedure, which gives as a ground for a new trial: "Material evidence, newly discovered, which could not with reasonable diligence have been discovered and produced at the trial, * * *."

Recent decisions on the question of granting a new trial for newly discovered evidence include Loughman v. Couchman, 243 Iowa 718, 53 N.W.2d 286; Westergard v. Des Moines Ry. Co., 243 Iowa 495, 52 N.W.2d 39; Modern Heat & Power Co. v. Bishop Steamotor Corp., 239 Iowa 1267, 34 N.W.2d 581; Eller v. Paul Revere Life Ins. Co., 230 Iowa 1255, 300 N.W. 535. All say that the trial court has a good deal of discretion in such a matter and we will not interfere with its ruling unless it is reasonably clear there was an abuse of discretion. Also requests for new trial based on newly discovered evidence are not favored, should be closely scrutinized and granted sparingly. Further, as the rule implies, a new trial should not be granted because of newly discovered evidence unless the applicant shows diligence on his part in not discovering it sooner. It is also elementary that a new trial should not be ordered for newly discovered evidence unless a different result because thereof is reasonably probable. Whether a new trial should be granted for new evidence which is merely cumulative is extensively considered in the Westergard case, supra.

In the light of these rules we think it is not shown the denial of a new trial based on Mr. Lee's proposed evidence was an abuse of discretion. Some of his testimony was cumulative to that given on the trial by Wilfred and Ethel. It is doubtful at best if plaintiff made sufficient showing Mr. Lee's evidence could not with reasonable diligence have been discovered and produced at the trial. It is of course not enough to show it was not discovered before the trial was concluded. The trial

court was in better position than we to determine the questions raised by the petition (as well as the other issues in the case) including the question whether a different result because of Mr. Lee's testimony would be reasonably probable.

Plaintiff cites Guth v. Bell, 153 Iowa 511, 133 N.W. 883, 42 L.R.A., N. S., 692, Ann. Cas. 1913E 142, as directly in point. But we think it is quite different. There one of the items of newly discovered evidence was given by the successful plaintiff in a subsequent trial of another case and it was absolutely inconsistent with the truth of his testimony in the case in which a new trial was sought. As to the other item of new evidence the trial court held due diligence in attempting to get it was shown but denied a new trial on the ground it was cumulative. We were clear the testimony was not cumulative and reversed the order refusing a new trial.—Affirmed.

All JUSTICES concur.