# IN THE COURT OF APPEALS OF IOWA

No. 22-1905
Filed December 6, 2023

**CONSERVATORSHIP OF JANICE GEERDES by LAURA JENKINS, Conservator,**
      Plaintiff-Appellee,

**vs.**

**ALBERT GOMEZ CRUZ,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Kossuth County, Don E. Courtney, Judge.

      Albert Cruz appeals the invalidation of a quitclaim deed because of undue influence and lack of mental capacity to execute the deed. **AFFIRMED.**

      Shaun Thompson of Newman Thompson & Gray PC, Forest City, for appellant.

      Kevin R. Sander of Fitzgibbons Law Firm, L.L.C., Estherville, for appellee.

      Heard by Bower, C.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

Janice Geerdes, a seventy-nine-year-old widow, deeded her long-time friend and business partner, Albert Cruz, her half-interest in property where they operated their joint hog operation and Cruz also lived. Six months later, one of Geerdes's daughters became her conservator and eventually sued Cruz to invalidate the quitclaim deed conveying the property. After a bench trial, the district court invalidated the deed—finding that Geerdes lacked the mental capacity to execute the deed and was subject to undue influence by Cruz. Cruz appeals, arguing that both findings were in error.

While this is a close case, when giving the district court's fact findings the weight they are entitled, we agree on our de novo review that the conservator has proven by clear, satisfactory, and convincing evidence that Geerdes lacked the mental capacity to execute the deed. Therefore, we affirm on that basis and decline to reach the district court's alternative basis for invalidating the deed.

I.

Geerdes and her husband lived in Swea City, where they eventually owned nearly 300 acres of farmland. Cruz met Geerdes and her husband in the early 1990s when he moved to the area and rented a home from the couple. He was about twenty years younger than Geerdes. And he quickly became friends with them. After her husband's death in 1999, Cruz continued his friendship with Geerdes, seeing her most days and helping her with tasks such as cleaning and driving her to the store or the doctor.

Geerdes used her farmland to generate income by renting it or by enrolling it in conservation programs. But she also began some business ventures with

Cruz. They drove a semi-trailer truck together for a while beginning in about 2004. Around the same time, they also started a hog operation on a small portion of Geerdes's property.

They constructed and operated the facility to raise hogs on a 9.64-acre parcel of farmland through a partnership called Blue Acres Pork. Cruz provided the labor—he is largely unable to read or write—and Geerdes ran the business side. Cruz cleaned the land to prepare it for construction and cared for the hogs for the first six months of the operation, after which the partnership used a third-party to care for the hogs.

As a part of this arrangement, in September 2004, Geerdes executed a warranty deed conveying a half-interest in the 9.64-acre parcel, which they then owned as tenants in common. The deed notes the conveyance was an absolute gift with no consideration. This first deed is not challenged here.

Geerdes received the entire income from their hog-operation partnership. But she then bought Cruz items such as groceries and gasoline or gave Cruz checks to pay him his share of the partnership income. Tax returns show Blue Acres Pork earned $73,406 in 2018 and $88,310 in 2019.

Geerdes involved Cruz in other significant decisions as well. Around 2016, Geerdes sold eighty acres of her farmland to a third party. Cruz advised Geerdes and accompanied her to meet with the lawyer for the sale. Geerdes ended up accepting a reduced per-acre price for the land to receive the full sales price immediately. The sale incurred a significant tax bill that Geerdes failed to timely pay.

In April 2017, Geerdes saw an occupational therapist for a cognitive assessment. The therapist performed the Saint Louis University Mental Status Examination (SLUMS) and the Revised Allen Cognitive Performance Test (CPT). On the SLUMS, she scored nineteen out of thirty points, and the therapist's notes indicate a score below twenty-one "denotes dementia for a person with a high school education." On the CPT, she scored thirty-three out of thirty-nine points, which denotes "mild cognitive-function disability." The notes explained that this disability may cause—among other impairments—problems with "judgment, reasoning, and planning ahead," and may cause Geerdes to "be impulsive or have problems anticipating consequences before acting." The therapist concluded she had "underlying dementia" and "needs frequent check-in support and assistance with instrumental activities of daily living."

Later that year, Geerdes was injured in a vehicle accident, requiring her to stay in the hospital for about one month. And in January 2018, Geerdes returned to occupational therapy for another assessment. She received similar scores on the SLUMS and CPT, though the notes indicate "previous testing experience may have favorably influenced testing scores." The therapist notes also said that Geerdes self-reported "recent mental status changes including decreased memory." And the therapist again concluded that Geerdes had dementia and "should receive assistance with bill paying" and "managing finances."

By this time, Geerdes's family also observed that Geerdes "seemed confused about a lot of things and pretty forgetful," so one of her daughters, Laura Jenkins, was indeed helping with her finances and bills. For example, Geerdes struggled to understand that bills had to be paid monthly. And she would try to

write checks or withdraw money from the ATM when she lacked sufficient funds in her account. Jenkins and another of Geerdes's daughters both observed that Geerdes's mental functioning continued to worsen after the accident. So did the farmer who rented land from Geerdes and often visited with her about financial and business matters. He testified that after the accident, mentally, Geerdes "was never the same again."

About a year later, in January 2019, Geerdes set about transferring to Cruz her remaining half-interest in the 9.64-acre property where they operated the hog business. By this time, Cruz also lived on the property with his daughter. Geerdes and Cruz met with Gayle Lemmon—an accountant who had worked with Cruz, Geerdes, and their partnership—to discuss executing a quitclaim deed for Geerdes to transfer her half-interest to Cruz. According to Lemmon, Geerdes did most of the talking during their meeting, drew a description of the land, and appeared to be the main decision-maker. She also testified Cruz "was kind of like a son to" Geerdes and Geerdes wanted to be sure Cruz received his share of the property.

Lemmon referred the pair to an attorney—who had never worked for Geerdes—to draft the quitclaim deed that same day. And they later returned to Lemmon to sign the deed in her presence, as she notarized it. The quitclaim deed notes Cruz paid Geerdes $1 in consideration for her property interest. In Lemmon's opinion, Geerdes appeared to have similar decision-making capabilities while meeting about the deed as Lemmon had observed before. At some point, Geerdes gave Lemmon a handwritten note, which says, "what I help [sic] Albert Cruz is nobody [sic] concern."

Jenkins discovered the quitclaim deed a couple of months later, in March 2019, while helping Geerdes with her finances. When Jenkins told her mother that the deed transferred the second half of the hog-business property to Cruz, Geerdes repeatedly denied that she had done so and told Jenkins "that's not what I wanted." Geerdes was often short of money around this time and had outstanding loans—including a loan of over $100,000 on the property she deeded to Cruz—as well as a remaining tax obligation from her 2016 sale of farmland.

Four months later, Jenkins became Geerdes's conservator. Shortly after, Geerdes moved to Kansas to live with another daughter, who immediately noticed that "her mental capacities wasn't good." Geerdes could not use a calculator to help with adding up receipts or take care of personal tasks like bathing, shaving, or combing hair. Geerdes shared that she had "a mess going on" and was "just waiting to die." By the end of the year, a Kansas court had appointed this daughter as Geerdes's guardian.

Jenkins, as Geerdes's conservator, sued Cruz in May 2020 to set aside the quitclaim deed. After a bench trial two years later, the district court found that Geerdes lacked mental capacity to execute the deed and Cruz exerted undue influence over Geerdes. The court thus set aside the deed. And Cruz now appeals.

## II.

The parties agree that this action to set aside the deed was heard in equity, so we apply de novo review. Iowa R. App. P. 6.907; *In re Est. of Herm*, 284 N.W.2d 191, 199 (Iowa 1979). We give weight to the fact findings of the district court, especially with regard to witness credibility, but we are not bound by them.

*Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003); *see also* Iowa R. App. P. 6.904(3)(g). Still, in a close case such as this, that weight may tip the balance. *See Groves v. Groves*, 82 N.W.2d 124, 130 (Iowa 1957) ("While the case may be close, when we give these findings the weight to which they are entitled we are not justified in reaching a contrary conclusion.").

To set aside the deed because of a lack of mental capacity, the conservator "had the burden to show by clear, satisfactory and convincing evidence that at the time [Geerdes] made the deed she was incapable of understanding in any reasonable manner the nature of the transaction and its consequences and effects upon her rights and interests." *Id.* at 131; *see also Costello v. Costello*, 186 N.W.2d 651, 654 (Iowa 1971) (describing issue as whether grantor "possess[ed] sufficient consciousness or mentality . . . to understand the import of her acts"). "A higher degree of mental competence is required for the transaction of ordinary business and the making of contracts than is necessary for testamentary disposition of property." *Costello*, 186 N.W.2d at 654–55 (citation omitted).[1] And it is not necessary "to establish complete mental incapacity." *Brewster v. Brewster*, 188 N.W. 672, 674 (Iowa 1922).

In evaluating Geerdes's mental capacity to execute the deed, we may judge her "weakness of mind" based on "other acts within a reasonable time prior and subsequent to" her execution of the deed. *Id.* We may also consider her "physical

---

[1] Cruz summarily argues that we should instead apply the lower testamentary standard because the quitclaim deed "was a gift." But Cruz cites no authority for extending this standard beyond dispositions under a will. We thus follow well-settled law requiring higher mental competence for all other transactions. *See Costello*, 186 N.W.2d at 654–55.

condition; the adequacy of consideration; whether or not the conveyance was improvident; [and] the relation of trust and confidence between" herself and Cruz. *Id.* Because this is a fact-specific inquiry, prior cases "are of little moment, and afford but weak precedents" in considering the proper result here. *Id.* at 673.

At the time Geerdes signed the 2019 deed, her physical health was fair as she still lived independently—though with considerable help from her children and Cruz with her finances and daily activities. The exact value of Geerdes's half-interest in the hog site is not in the record, but the $1 consideration Cruz paid for that half-interest is clearly not even close to fair compensation for the property. This transaction was also improvident considering that Geerdes was often low on cash and had large outstanding financial obligations, including a loan on the very land she was transferring. And Geerdes placed significant trust and confidence in Cruz as a decades-long friend and business partner, as shown by their joint business ventures and his advice for the 2016 sale of farmland.

Another factor in evaluating mental capacity is the lack of independent advice. *See Daughton v. Parson*, 423 N.W.2d 894, 896 (Iowa Ct. App. 1988). Cruz notes that he and Geerdes saw both accountant Lemmon and an attorney before Geerdes signed the deed. But Cruz did not testify that Geerdes received any independent advice about the deed. What's more, according to Lemmon, Geerdes came to her for the express purpose of transferring the hog-operations property to Cruz. Lemmon did not say that she gave her any advice beyond directing her to an attorney to draft the deed. Geerdes and Cruz met that attorney for the first and only time later that day. And others with whom Geerdes normally discussed financial matters—her daughter Jenkins and her farm tenant—testified

that she never discussed the possible transfer before signing the deed. Considering all this testimony and the compressed timeline, there is no indication Geerdes received any meaningful independent advice before signing the deed.

But most important to our analysis is Geerdes's mental weakness before and after signing the deed. Her medical records show signs of dementia beginning nearly two years before signing the deed. Indeed, her occupational therapist specifically noted that her mental impairment could cause her to "be impulsive or have problems anticipating consequences before acting" as well as issues with "judgment, reasoning, and planning ahead." And consistent with the recommendations of the therapist—at the same time Geerdes signed the deed—Jenkins managed all her finances because Geerdes no longer understood how to do so on her own.

Her children and her farm tenant also testified that her mental condition had not improved by the time she signed the deed. Just two months after signing the deed, when Jenkins discovered the deed, Geerdes did not remember or understand its effect. And only six months after signing the deed, Geerdes moved in with one of her daughters and was no longer living independently. Indeed, while neither judicial proceeding is part of our record, Geerdes was under both a conservatorship and a guardianship within one year of signing the deed.

Cruz maintains the conservator did not carry her burden to prove lack of mental capacity. And to be sure, Geerdes's medical records show only "mild" cognitive impairment. *See Daughton*, 423 N.W.2d at 897 ("[M]ere mental weakness or unsoundness to some degree is not sufficient in the absence of fraud or undue influence, to invalidate a contract." (citation omitted)). Lemmon, the only

non-party witness who testified to Geerdes's mental state at the specific times Geerdes requested and signed the deed, said she appeared to understand the deed. The conservator did not present expert testimony, and her only witnesses were Geerdes's children and her farm tenant—all of whom displayed animosity toward Cruz and, at least as to her children, could benefit from the hog site interest being returned to Geerdes. *Accord Hart v. Lundby*, 137 N.W.2d 642, 647 (Iowa 1965) ("Failure to call witnesses, expert or nonexpert, or failure to ask questions of witnesses who are closely and intimately acquainted with testator as to the question of mental incapacity militates against a contestant.").

But to the extent the witness testimony was in conflict, the district court's thorough fact findings show that it implicitly found the conservator's witnesses more credible on their observations of Geerdes's mental state around the time she signed the deed. We place weight on these findings. *See Mendenhall*, 671 N.W.2d at 454. We also discount Lemmon's observations because of the limited nature of her meetings with Geerdes concerning the deed compared to the more extensive interactions of the other witnesses.[2] And Cruz left the conservator's medical evidence of Geerdes's mental weakness unchallenged—presenting no

---

[2] Admittedly, there is some intellectual tension in the long-standing dictates that we simultaneously "give weight to the trial court's findings" and conduct "de novo" review. *Groves*, 82 N.W.2d at 131. But unlike the dissent, we see no inconsistency in giving those findings weight while also independently assessing and explaining the bases for them that can be seen from the written record. Since we are agreeing with the district court's findings, it would be of no consequence if the district court also had other reasons—such as witness demeanor—not apparent from the record for discounting Lemmon's testimony.

conflicting medical evaluation nor any expert testimony to undermine the otherwise clear conclusions in the medical records.[3]

Considering the heightened mental capacity required for an inter vivos transfer and the record as a whole—especially Geerdes's mental state in the months before and after signing the deed—we agree the conservator carried her burden to prove Geerdes did not understand the effect of the deed when she signed it. We thus affirm the district court's ruling invalidating the deed transferring Geerdes's half-interest in the hog-operation property to Cruz because she lacked the mental capacity to execute it.

**AFFIRMED.**

Bower, C.J., concurs; Buller, J., dissents.

---

[3] We recognize that Cruz did not have to present any evidence at all since the burden of proof always remains on the conservator seeking to invalidate the deed. *See Groves*, 82 N.W.2d at 131. But in the absence of any evidence in this record that this medical evidence is unreliable, we will not disregard it based on mere arguments on appeal or expert testimony presented in other cases from other jurisdictions.

**BULLER, Judge** (dissenting).

"Clear and convincing evidence is the highest evidentiary burden in civil cases. It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *In re N.C.*, 952 N.W.2d 151, 153 (Iowa 2020) (internal quotation marks and citation omitted). Because I believe the majority opinion is not faithful to the burden of proof required by precedent and erroneously defers to a district court ruling that lacks credibility findings or assessment of any expert testimony, I cannot join. I would reverse the district court because I believe after-the-fact observations by self-interested lay witnesses, standing alone, are not enough to satisfy our highest civil burden. In this record, the sole unbiased witness described Geerdes as entirely capable when transferring property consistent with her expressed wishes. Based on this record, I would find the district court erred when it invalidated Geerdes's transfer of property to Cruz. I dissent.

But first, a point of agreement. The majority opinion bypasses the primary holding of the district court, which was that Geerdes and Cruz were in a "confidential relationship" that triggered a presumption of undue influence (and placed the burden of proof on Cruz). This finding made up the lion's share of the district court ruling but is not relied on by the majority opinion, presumably because it is not supported by the record. I would find the district court's conclusion on undue influence was a material error warranting reversal, and I am concerned it colored the remainder of the ruling by impermissibly shifting the burden of proof.

Where I part ways with the majority opinion is in its reliance on capacity as an alternative basis to affirm. The capacity analysis by the district court was

abbreviated and ran only a handful of sentences at the very end of the opinion. This is what it says, in its entirety:

> Even if the court were to find that they were not in a confidential relationship the court finds that [Geerdes] lacked the requisite mental capacity to quit claim her interest in the property. Her medical records indicated as early as 2017 that she had dementia. The dementia in combination with her age and physical health, the lack of consideration, and the improvident nature of the transaction given that she retained the debt on the property convinces this court that from the entire record there is clear, convincing, and satisfactory evidence that the grantor, [Geerdes], did not possess sufficient consciousness or mentality to understand the import of her acts when the deed was executed. The deed therefore must be and is set aside. The court finds the conveyance invalid.

The majority expands on this holding significantly to affirm. Based on my review of the record and precedent, I cannot join the majority in finding this analysis is supported by clear and convincing evidence such that we can invalidate Geerdes's property rights. I would instead reverse the district court.

### A. "The Highest Evidentiary Burden in Civil Cases"

I appreciate the majority's acknowledgement this is a "close case," and I agree. Often in civil litigation, a "close case" can still supply a victory for the plaintiff, as the typical burden of proof is only by a preponderance of the evidence. Iowa R. App. P. 6.904(3)(f). In other words, it's usually enough that a plaintiff has proven the facts supporting a claim are probably true. *See Holliday v. Rain & Hail L.L.C.*, 690 N.W.2d 59, 64 (Iowa 2004). If the law only required a preponderance of the evidence to affirm here—a determination Geerdes *probably* lacked capacity—I might not be writing separately. But the law requires more when a plaintiff seeks to invalidate someone's right to transfer property as they wish.

"On [a] claim of mental incapacity [the] plaintiff ha[s] the burden to show by clear, satisfactory and convincing evidence that at the time she made the deed she was incapable of understanding in any reasonable manner the nature of the transaction and its consequences and effects upon her rights and interests." *Groves v. Groves*, 82 N.W.2d 124, 131 (Iowa 1957); *see Daughton v. Parson*, 423 N.W.2d 894, 896 (Iowa Ct. App. 1988) ("The party alleging lack of mental capacity sufficient to execute a deed has the burden of proving by clear, convincing, and satisfactory evidence that the grantor did not possess 'sufficient consciousness or mentality . . . to understand the import of her acts' when the deed was executed."). As I mentioned at the outset, clear and convincing "means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *N.C.*, 952 N.W.2d at 153 (citation omitted). This burden "refers to the *character or nature of the evidence*, whereas 'preponderance' of the evidence is a *quantitative* measure." *Holliday*, 690 N.W.2d at 64 (citation omitted).

I have serious and substantial doubt about the correctness of the district court's conclusions here. While there are certainly occasions where I would appropriately affirm a "close" civil case decided by preponderance of the evidence, even on de novo review, I cannot do so in a case that commands our "highest evidentiary burden in civil cases." *See N.C.*, 952 N.W.2d at 153. To invalidate a person's autonomy over their property requires more than a close evidentiary record, and our case law compels me to reverse.

**B.  The Best Evidence in this Thin Record Supports Reversal**

I have no serious complaints about the majority opinion's recitation of facts, but I think what's contained in this unusually thin record warrants additional

discussion.  Of the six lay witnesses who testified at trial, Cruz and accountant Lemmon are the only witnesses who could testify regarding Geerdes's capacity on the day she signed the deed.  Setting aside Cruz's testimony due to his interest in the case, we are left with the testimony of Lemmon, who has no dog in this fight.

Lemmon explained she provided tax services to Geerdes for around fifteen years before Geerdes came to her in 2019 and requested help transferring property to Cruz.  Lemmon described how Geerdes's request was unambiguous and Geerdes—not Cruz—was the one "doing most of the talking" and "driving the decision."  Lemmon observed Geerdes had a good understanding of the property she was transferring "[b]ecause she even drew out the description of it and where she wanted the lines to go on an aerial photograph."  *Cf. In re Est. of Johnson*, No. 22-1730, 2023 WL 7015335, at *2 (Iowa Ct. App. Oct. 25, 2023) ("[C]ourts consider a testator's understanding of the nature of the interest held in their property when deciding whether the testator had capacity.").  Lemmon opined that Geerdes appeared "to be in a similar mindset regarding her decision-making capabilities" in 2019 as Geerdes had been in 2004 when they first met.  And she relayed to the court that Geerdes told her she wanted to execute the deed "to make sure that [Cruz] had gotten his share of the property" because her daughters "did not like" Cruz.  This explanation is borne out and corroborated by Geerdes's handwritten note and reflected in the apparent animosity between Cruz and her daughters at trial.

Weighing this good evidence of capacity against the daughters' and farm tenant's self-interested testimony describing Geerdes's mental status on other dates, I have serious doubts about the correctness of the district court's

conclusion. The majority opinion may be right that this was an "improvident" decision from a purely financial perspective. But it's clear from this record that Geerdes wanted to transfer the property to Cruz for personal, rather than financial, reasons. This makes sense given the history between the two, which the majority opinion fairly summarizes in describing them as "long-time friend[s] and business partner[s]." I do not believe our law allows us to strip a person's autonomy when their motivation to transfer property is more personal than profit driven. Among the limited pertinent facts in this record, the better evidence suggests Geerdes had capacity when she signed the deed. I cannot find by clear and convincing evidence that Geerdes "was incapable of understanding in any reasonable manner the nature of the transaction and its consequences and effects upon her rights and interests." *Groves*, 82 N.W.2d at 131; *see Daughton*, 423 N.W.2d at 896.

Perhaps more important than what's in this record, however, is what's missing: credibility findings and expert testimony.

### C. No Credibility Findings

I have written before about "the difficult position the appellate courts are put in when the district court does not make express credibility findings or explain why it is rejecting what appears to be credible testimony in favor of other evidence." *Connell v. Barker*, No. 22-1791, 2023 WL 4759458, at *4 (Iowa Ct. App. July 26, 2023) (Buller, J., specially concurring). This is another case where the district court's failure to make credibility findings hamstrings our review. The majority opinion apparently concedes there were no explicit credibility findings anywhere in the district court's ruling and instead insists the district court "implicitly found the conservator's witnesses more credible on their observations of

Geerdes's mental state around the time she signed the deed." I've looked carefully for any implicit credibility findings in the district court ruling, and I can't find them. The entirety of the district court's capacity analysis is reproduced near the beginning of this dissent, and I sincerely question whether anything in that five-sentence paragraph can be stretched into an implicit credibility determination. At most, the facts section of the ruling contains a summary of the evidence presented at trial, which does nothing to facilitate appellate review. It seems to me the majority opinion is paying deference to the outcome below—rather than the fact findings—which I doubt our law supports. *E.g.*, *In re Est. of Johnson*, 739 N.W.2d 493, 496 (Iowa 2007) ("Of course, under a de novo review we will make our own legal conclusions, as we are not bound by and give no deference to the trial court's conclusions of law.").

Confusingly, the majority opinion "place[s] weight" on and defers to the district court's purported credibility findings made below, but simultaneously makes its own credibility findings about Lemmon based on "the limited nature of her meetings with Geerdes concerning the deed." Setting aside that this overlooks the fifteen-year history between Lemmon and Geerdes, the district court never expressed concern about the "limited nature" of their contact surrounding the deed. This is a credibility finding made for the first time on appeal. This finding undermines the basis for the majority opinion's deference to the district court, which is premised on the factfinder being in a better position to evaluate credibility. My perspective is we should either admit the ruling does not contain fact-findings supported by credibility determinations or we should restrain ourselves from judging credibility ourselves on a cold record—we can't have it both ways.

**D. No Expert Testimony**

Given the significant burden required to invalidate Geerdes's property rights, I would also find the lack of expert testimony fatal to the plaintiff's challenge to Geerdes's capacity. I am not personally inclined toward a rule requiring expert testimony in every case litigating capacity, and it appears the majority rule prefers this be decided on a case-by-case basis. *See State v. Gardiner*, 895 A.2d 703, 712 n.11 (R.I. 2006) (collecting cases); *but see In re Est. of Boyd*, 798 S.E.2d 330, 332 n.4 (Ga. Ct. App. 2017) (noting that, among other things, "the submission of [a person's] medical records without expert testimony interpreting them" is insufficient to meet the burden to prove incapacity).

In this particular case, the record is too thin to find lack of capacity by clear and convincing evidence without the benefit of expert testimony. For just one example of why, the medical records the majority opinion claims offer "clear conclusions" actually use generic and wishy-washy language like "[p]roblems *may be* observed," "[m]inor problems *may be* noticed," "the person *may be* impulsive or have problems," and "difficulties *may* manifest" in describing the "mild" cognition issues suggested by limited testing. And even these records—arguably the best evidence supporting the plaintiff—were created a year before the transfer and by an occupational therapist, who I am skeptical could opine on capacity under Iowa Rule of Evidence 5.702. *See* Iowa Code § 148B.2(3) (2022) (on the scope of practice for occupational therapists); Iowa Admin r. 645–208.1 (same). Neither our court nor the district court have the appropriate medical expertise to extrapolate from the conditional and ambiguous language about capacity in the records to the certainty required by the clear-and-convincing evidentiary burden.

These facts are a far cry from the rare appellate case affirming incapacity absent expert testimony. *See Gibbons v. Redmond*, 49 P.2d 1035, 1039 (Kan. 1935) (describing record where, despite no relevant physical limitation, testator's mental decline was so severe he could not sign his own name). And the records, contrary to the majority opinion's assertion, offer no "clear conclusions."

In conducting a review of comparable cases from other jurisdictions, it seems telling that virtually every case to consider the import of cognitive testing like the SLUMS (relied on by the district court and majority opinion) has turned on expert testimony—and usually that of more than one expert. *See, e.g.*, *Wiseman v. Keeter*, 550 S.W.3d 883, 884 (Ark. Ct. App. 2018) (summarizing expert testimony explaining a SLUMS score of 1/30); *In re Guardianship of A.M.Q.*, No. 2015AP2614, 2017 WL 1386352, at *3–4 (Wis. Ct. App. Apr. 18, 2017) (summarizing competing expert testimony on SLUMS and other cognitive testing); *In re Coleman*, No. 2132 EDA 2014, 2015 WL 7355666, at *6 (Pa. Super. Ct. Mar. 30, 2015) (summarizing expert testimony explaining SLUMS scores of 17/30 and 23/30 in the context of other cognitive testing). I have not found any case from any jurisdiction where an appellate court has affirmed a finding of incapacity based upon a borderline score—like Geerdes's SLUMS results—absent expert testimony. And I cannot join the majority to be the first to do so.

To the extent I have found comparable cases, some courts have recognized that SLUMS scores well-below Geerdes's do not necessarily indicate incapacity in civil litigation or incompetence to stand criminal trial. *See United States v. Kight*, No. 1:16-CR-99-WSD, 2018 WL 672119, at *3 (N.D. Ga. Feb. 2, 2018) (finding offender with score of 17/30 on SLUMS was competent to stand trial); *In re Est. of*

*Kusmanoff*, 83 N.E.3d 1144, 1172 (Ill. App. Ct. 2017) (finding guardianship not appropriate, and that subject of proceedings still had capacity, despite "mild or moderate decline in cognitive function," including memory loss and other difficulties documented in part by a 13/30 SLUMS score). This casts further doubt on the district court ruling in the absence of expert testimony.

Last on this front, I specifically disagree with the majority opinion's criticism that "Cruz left the conservator's medical evidence unchallenged" because he did not present his own medical evaluation or expert testimony. This criticism inappropriately shifts the burden to Cruz, who—absent a proven confidential relationship—had no obligation to furnish evidence, and certainly no duty to find his own expert to rebut testimony never offered by the plaintiff. It seems the majority opinion has committed the same error as the district court, implicitly shifting the burden to Cruz rather than the plaintiff where it belongs. At risk of beating a dead burden-of-proof horse, the plaintiff bore the highest burden authorized by civil law, and I believe it is error to shift the plaintiff's shortcomings to a defendant who need put forward no evidence to prevail.

In sum, I dissent because I believe the plaintiff did not prove its case to the satisfaction of our highest evidentiary burden. Absent credibility findings or expert testimony, the district court ruling is not supported by clear and convincing evidence. The United States Supreme Court has consistently informed us the level of certainty required by the clear-and-convincing-evidence standard is "necessary to preserve fundamental fairness" in proceedings "that threaten the individual involved with a significant deprivation of liberty or stigma." *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (internal quotations and citations omitted).

Finding a "close case" with a thin record to be sufficient evidence in those proceedings would be troubling. *See, e.g., id.* (irrevocable termination of parental rights); *Addington v. Texas*, 441 U.S. 418, 424 (1979) (involuntary civil commitment); *Woodby v. INS*, 385 U.S. 276, 285 (1966) (deportation from United States); *Chaunt v. United States*, 364 U.S. 350, 353 (1960) (denaturalization). The evidence in this case does not rise to the level of clear and convincing, as precedent requires us to find before invalidating invalidate an Iowan's right to transfer property. I would reverse.